[Crim. No. 30954. Second Dist., Div. One. Aug. 1, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
GEORGE PATRICK McKINNEY, Defendant and Appellant.

## COUNSEL

James M. Epstein, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger and George Deukmejian, Attorneys General, Jack R. Winkler and Robert H. Philibosian, Chief Assistant Attorneys General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**RINGER, J.**\*—For reasons to be explained later on, we open this opinion by sketching the case for the defense.

On March 13, 1974, a paroled federal prisoner named George Patrick McKinney came by car in violation of his parole from Springfield, Illinois to the King's Square Apartments in Garland, a small town surrounded by

*Assigned by the Chairperson of the Judicial Council.

Dallas, Texas. Using his own name, but representing himself to be a relocating employee of Monsanto Chemicals, McKinney signed a lease for apartment 107-A, two weeks' rent being paid in advance by his companion, a local resident named John Nabors, whose brother Raymond, an ex-convict, owned a trucking and hauling business that was in a desperate financial condition. McKinney was an accountant, having claimed in a newspaper interview that he had a master's degree in accountancy from Stanford University. He entered the apartment once, he did not occupy it, and he did not take any luggage into it. Instead, he examined the books of the Nabors' business, decided that it could not be salvaged, and drove home the next morning, where, on March 17th, he, his wife Vivian, and about 30 others celebrated St. Patrick's Day, one participant in the celebration, a former federal prisoner named Vaughn, travelling from Chattanooga, Tennessee. McKinney then went back to work, assisting an itinerant wholesale carpet dealer named Staff. Later, he was hired by the State of Illinois as chief accountant "in charge of the Motor Vehicle Division Garage Revolving Fund which is responsible for the expenditures of probably a million dollars a day," and, in May 1975, he went to work for the "Chief Commander" of a veteran's organization in Springfield.

There was at this time in Springfield a restaurant called the Soho, which had been closed for three years and was up for sale or lease. A liquor license was available by transfer from a licensee named Swallows; all the kitchen equipment was in order; there was a stock of unopened liquor bottles in the bar; even the silverware and table linen were ready to be used. The Soho was to be a seafood restaurant, there being no others in Springfield. McKinney had arranged with an ex-convict named Clubb to supply the Soho with seafood directly from New Orleans; Mrs. McKinney would sing; McKinney would manage the establishment; the Soho would be ready to open after two or three days' work and with an initial investment of $10,000. The owner, a Mrs. Maero, told McKinney that if she could not sell the restaurant she would seriously consider leasing it to him.

At 2:45 a.m. on September 19, 1975, McKinney telephoned Clubb about the seafood, and that night he flew to Los Angeles under an assumed name, being met through prearrangement by one Jerald Dee Sartain, a forger, burglar and robber on mandatory release from federal prison following a 1965 conviction for bank robbery and possession of a sawed-off shotgun. Sartain worked for a printer and lived with a Jean Appel and her daughters Donna and Alice in a dilapidated house in

Van Nuys belonging to Sartain's mother which McKinney characterized as "early pigpen." McKinney and Sartain had met in prison; the purpose of McKinney's trip was to raise the $10,000; Sartain was to become McKinney's partner in the restaurant.

Before driving McKinney to his home, Sartain took him to the NuWay, a cocktail lounge next to a chili-dog restaurant at Pico and Bundy in West Los Angeles. McKinney became uneasy; this trip, too, was a parole violation; the NuWay looked like a "character hangout." At the NuWay, Sartain reintroduced him to a Melvin Loether, otherwise known as Robert Loether or "Bobby Box"; McKinney had known Loether in federal prison years before and did not trust him.

The following morning, Saturday, September 20th, Sartain rented a van in order to move some furniture. The two men then drove to "the Marina" and met a lawyer named John Alan Montag, who had previously represented Sartain. Sartain asked Montag for the $10,000, claiming that Montag owed him $13,000 or $14,000; Montag said he owed just over $8,000. Bullying Montag for repayment, Sartain succeeded in getting Montag to write a number of small checks at stores and markets and in getting him to purchase a $1,200 gold medallion for $1,000 at a jewelry store; McKinney did not participate in the bullying and, being unfamiliar with Los Angeles, he looked at the scenery while Montag and Sartain transacted their affairs. Sartain kept the money and the medallion. The van was not used to move furniture. Disappointed because his trip had been at his own expense and had proved useless, McKinney returned that night to Springfield.

On the night of October 9, 1975, travelling again in violation of his parole and under the name of Dr. Richard Merleston, McKinney flew back to Los Angeles. Sartain had told him over the telephone that he had the $10,000, said that he wanted to talk to McKinney about something that would permit him to buy 10 restaurants, and wired him the plane fare. At Sartain's house, Sartain showed him a brief case containing a .22 caliber pistol equipped with a silencer; he also showed him another gun, 2 walkie-talkies and several sets of handcuffs; he flashed a roll of bills that McKinney thought might amount to $800. McKinney remembered watching sky-writing airplanes through Sartain's binoculars; one of the planes was writing "Happy Hanukkah."

Sartain proposed to McKinney that they join with Loether, Montag and a Mrs. Delores Watson, known as "Dee," in the robbery, and, if

necessary, in the kidnaping of a narcotics courier who was reputed to carry as much as $200,000 on trips to his "drop" in Bakersfield. Montag was to "bankroll" the robbery, and McKinney's share was to be $40,000. At first rejecting the proposal because he wanted $100,000, and without risk, McKinney tagged along after Sartain, hoping to obtain the $10,000 he needed to open the Soho. On October 12th, Loether was in Florida. At about 5 p.m., McKinney accompanied Sartain to the NuWay; Sartain went inside while McKinney waited for him to receive a call from Loether giving further details of the planned robbery, McKinney being reluctant to participate without knowing them. Sartain returned, explaining that he had talked to Loether, saying also that Loether would call him back. McKinney declined to wait any longer. Sartain said, "George, there is no point in your going back empty-handed. That loan shark I was telling you about is right inside and he is drunk. Why don't we rip him off?" The "loan shark" was not the narcotics courier; as we shall explain later, the "loan shark" was one Herbert Chance, who was a drunk. McKinney rejected Sartain's "fly-by-night" request, drove to Sartain's house, walked to a toy shop, which was closed, went to a bar, and returned to the house, where Sartain later arrived in a Mercedes-Benz which he said he had borrowed from a friend. Sartain then drove McKinney and Donna Appel to the Los Angeles airport; Donna was unhappy in Los Angeles, and McKinney had promised Sartain to take her to live with relatives in Belleville, Illinois. Tickets for McKinney and Donna were purchased at 11:04 p.m.; their plane left for St. Louis at 12:05 a.m. on October 13th. We take judicial notice that Belleville is 14 miles from East St. Louis and that Springfield is about 100 miles from both.

At 6 p.m. on October 25th, Sartain telephoned McKinney at the latter's home in Springfield, explaining that he was in a "world of trouble" and was going to "split," referring to his status on mandatory release. McKinney was arrested on October 28th, resisted extradition, and made his first appearance in Los Angeles Superior Court on March 8, 1976, when he was served with an indictment containing many charges, among them charges involving Montag. Concerned because Montag was a lawyer whose testimony would be more acceptable than his, McKinney offered an inmate named Wendell Hall $200 to have someone outside jail "go to Mr. Montag's office and secure Mr. Sartain's phone number from him, and, if he did not have it, to have it the next time Mr. Sartain called him, get in touch with my wife, that she was now living in Los Angeles, and I told Vivian to call Jerry's wife and tell him the same, or tell her the same thing, that if Jerry contacted her, to please get in touch with her. I

wanted to apprise Jerry of what I was charged with, what his friend Mr. Montag was doing to me. I was just desperate you know. I was grasping at a straw." Later, Hall offered to have a friend throw Montag out of Montag's office window; McKinney agreed to consider the proposal "if it can be done cheaply," but he decided to reject it. Hall's murder offer occurred on March 15th; Sartain was arrested on March 28th in St. Louis.

The charges served upon McKinney arose out of the deaths of Herbert Chance, who owned the NuWay, and of his wife, Virginia, who were murdered in their home between 9 and 10 p.m. on October 12th; out of the death of Dee Watson, who was murdered in Loether's car on a residential street about a block from the NuWay at 1 a.m. on October 13th, less than an hour after McKinney was airborne to St. Louis; and out of the appropriation of money and jewelry from Montag on September 20th. The motives for these offenses were as follows: (1) Obtaining money from Montag by force and fear after a trip in Sartain's rented van on September 20th to the Magic Mountain area to rob and kill a narcotics courier failed in its purpose, the courier having omitted to keep an appointment there with Sartain; (2) stealing from Chance a large sum of money just transferred to him in order for him to "launder" it; (3) the assassination of Chance by a group Sartain described as "the syndicate" and as "the outfit" and which McKinney described as "the fellows" because of Chance's agreement to testify against one Clarence "Chauncey" Smaldone in a federal bookmaking prosecution in Denver, Colorado; (4) the assassination of Dee Watson because she knew too much and talked too much.

We have begun with McKinney's evidence because Montag and Sartain were the chief witnesses for the People, because McKinney urged upon the jury that Sartain alone obtained the money and jewelry from Montag on September 20th and personally killed the Chances and Dee Watson in a conspiracy with Montag, and because both Montag and Sartain are confessed perjurers.

There were two indictments in this case, A 323039 and A 327714. In A 323039, only McKinney and Sartain were accused. Counts XII, XIII, XIV and XV charged them with extorting $1,200 from Montag on September 23d, $2,500 from him on October 1st, $1,000 from him on October 7th, and obtaining the lease of a car from him on October 13th by extortionate means. Those four counts were based upon the perjured testimony of Montag before the grand jury, perjury which he admitted at the trial, perjury he testified having committed in order to conceal the fact that he

paid the money to Sartain to murder McKinney and to finance a Florida burglary for Sartain, and that he leased the car for Sartain to enable him to travel to Florida to retrieve the proceeds of the burglary. The second indictment, A 327714, rested, among other things, upon the testimony of Sartain, who had agreed to turn state's evidence as part of a plea bargain and sentence bargain to be described at a later point. That indictment charged McKinney, Loether and one Anthony Borsellino with offenses involving the Chances and Dee Watson, including the three murders, and included allegations of special circumstances invoking a mandatory death penalty under the 1973 legislation. The charges against Loether were ultimately dismissed because the People announced that they had insufficient evidence to corroborate Sartain; those against Borsellino were dismissed earlier because Sartain's perjured testimony before the grand jury identifying Borsellino as one of the killers was refuted by proof developed through subsequent police investigation that Borsellino was in Illinois on October 12th and 13th. Sartain admitted the perjury at trial, explaining that he wanted to get "some evens" against Borsellino; he was shot at in New Orleans a month after McKinney's arrest; friends in Florida told him later that there was a contract for his death, the contract coming out of Chicago from Borsellino.

But contract for contract, and lie for lie, there is no room in the record for nice moral distinctions between McKinney and his principal accusers. As we shall see, McKinney conspired in county jail to have Montag, Jean Appel and Jean's daughter Donna murdered by persons whom he believed to be friends of Wendell Hall; they turned out to be undercover police officers. And everything in McKinney's testimony that could be challenged by impartial witnesses was definitively challenged and proved to be a fiction. McKinney had never worked for Monsanto Chemicals. Stanford University had never heard of him. His job with the Illinois Department of Motor Vehicles was a subordinate one; he got it by misrepresenting that he had a degree from Stanford University and had a military record. The veteran's organization printed a magazine and sold advertisements. The Soho was for sale and not for lease; it was part of a larger building, whose roof had leaked for seven or eight years; there was no liquor supply and no kitchen equipment; Swallows' liquor license was revoked effective September 30, 1975, and Swallows notified McKinney of the revocation several days later; it would have taken at least 60 days' work and a minimum of $80,000 to put the Soho in operating condition and to hire helpers. When he leased the apartment in Garland, Texas in March 1974, McKinney paid the rent himself; Nabors was not with him; he brought his suitcase into the apartment; he was seen around the

apartment house on a number of occasions during the week after March 13th; on April 7th, a week after his rent ran out, the apartment was entered for cleaning; inside a Safeway market shopping bag in a hall linen closet were a wig, a false moustache, medical adhesive tape and two pairs of handcuffs of Japanese manufacture; when the bodies of Mr. and Mrs. Chance were discovered, their hands were handcuffed behind their backs. We add to this that Montag testified that he was handcuffed on September 20th, that Sartain testified Montag was handcuffed, and that seven weeks after his arrest, Sartain led the police to a buried cache containing handcuffs, one of them of the same brand as those found in the vacated apartment in Garland. And now we turn to a specific statement of the charges and of the results of the charges in this whirligig of plot and counterplot, of perjury, theft and murder.

In a jury trial upon 17 counts, McKinney was convicted of the first degree murder of Herbert Chance (count I); kidnaping Chance to commit robbery, with bodily harm (count II); the first degree robbery of Chance, with great bodily injury (count III); the first degree murder of Virginia Chance (count IV); the first degree robbery of Mrs. Chance, with great bodily injury (count V); the first degree burglary of the Chances' residence (count VI); conspiring with Sartain to rob Chance (count X); kidnaping Montag to commit robbery (count XVI); and the first degree robbery of Montag (count XVII). At the close of the People's case, the court granted McKinney's motion for acquittal upon count XIV, which charged him with conspiring with Sartain to murder Montag; similar motions were denied as to count VIII (felony assault upon Montag) and count XV (conspiracy with Sartain to assault Montag), but for unexplained reasons those two charges did not go to the jury. The jury was unable to agree as to count VII, which charged McKinney with murdering Mrs. Watson, count IX, which charged him with conspiring with Sartain to kill Chance, counts XI and XII, which charged him with conspiring with Sartain to murder and rob Mrs. Chance, and count XIII, which charged him with conspiring with Sartain to murder Mrs. Watson. Counts VII, IX, XI, XII and XIII were likewise dismissed, and McKinney was sentenced upon count II to life imprisonment without possibility of parole, that sentence to be served consecutively to his federal sentences, and he was credited with 481 days' time previously served. Life sentences were imposed upon counts I, IV and XVI; sentences to prison for the term prescribed by law were imposed upon counts III, V, VI, X and XVII; execution of service of sentence upon all counts other than count II was ordered stayed pending appeal and pending service of sentence on the second count. McKinney appeals from the judgment.

We have mentioned a fraction of the evidence upon which the judgment rests, and will now describe the remainder. Loether worked for Chance, and was to take over the NuWay if anything happened to his employer. Dee Watson also worked at the NuWay; she lived with her three small children in an apartment belonging to Loether. Heroin, cocaine, guns and women were available at the lounge, either through Loether or Dee Watson. As we have said, Chance was a "loan shark"; called also a "juice man," he took custody of syndicate money and lent it out at exorbitant rates of interest. His wife's cousin, a Jean Reeb, was involved in the Smaldone bookmaking operation in Denver; this led to his being contacted and to his agreement to testify. The Chances lived on Lake Street in Venice in a house with an electronic garage, multiple front doors and barred windows; it is referred to in the evidence as a "fortress."

Loether, McKinney and Sartain had met in federal prison. McKinney's sentences were for a $190,000 1953 New York bank robbery involving the kidnaping of a bank manager, for a 1963 Illinois bank robbery, and for escape; Sartain was a writ-writer, having "walked 32 men out of Leavenworth" though he lost his own writs; Loether and McKinney were grateful to him because two writs he wrote got them reduced sentences. Sartain assumed that McKinney knew Smaldone in prison because "everybody was there when I was there."

Sartain's sentences were due to expire in the year 2001. On July 16, 1975, he was mandatorily released from prison, drove to Los Angeles with Jean Appel and her two daughters and reported to a "halfway house." All the strands in this case begin to weave together on July 20th, when Sartain arrived unexpectedly at Montag's office at 3600 Wilshire Boulevard, stating that he had just got out of prison, was unemployed, and needed money. Montag had represented Sartain in the 1965 bank robbery prosecution, had visited him in prison, corresponded with him and argued writs for him in court. Montag was now handling a civil case for Loether's mother. Montag was a friend of the Sica brothers and of Mickey Cohen, having advanced Cohen $5,000 to help finance a movie about Cohen's life in hopes of obtaining a judgeship; he told Sartain about his relationship with Cohen; Sartain told Montag Loether was angry at him. A week later, Loether telephoned Montag, threatening to "break his legs" unless he took care of his mother's lawsuit. Montag asked Sartain to intercede for him with Loether, and gave Sartain Loether's telephone number at the NuWay. Upon visiting the lounge and meeting Loether, Sartain learned about the loan-sharking, the guns and the narcotics.

Some time in September, Loether, Sartain and Dee Watson delivered between $150,000 and $250,000 of "hot" money to a narcotics distributor in Bakersfield who was suspected of "holding out" and selling drugs on credit. Dee Watson told her husband about the trip, he began "running his head" about her activities, and Sartain decided that she "had to go"; Watson related what Dee had told him at the trial. A decision was made to kill the distributor, Loether recommended McKinney to Sartain, McKinney's credentials were checked out, and, as we have said, McKinney arrived on September 19th. He brought with him some handcuffs, mace, two walkie-talkies, a wig, a .32 caliber automatic and a .22 caliber automatic equipped with a silencer, explaining to Sartain that he had purchased the silencer for $600 from Clubb in New Orleans.

The following morning, September 20th, Sartain rented a van. The rental was confirmed by independent evidence. Sartain and McKinney then drove to the Magic Mountain area to meet, rob, kill and bury the distributor, who did not show up. Their purpose frustrated, Sartain said to McKinney, "Let's make some expenses." Sartain telephoned Montag, and Montag agreed to meet them at a doctor's office in Santa Monica where he was to get an allergy shot. Montag's medical appointment was confirmed by the records of his doctor. When the two men arrived, Sartain introduced McKinney as a potential client named Nelson. Sartain had chosen Montag as a victim because of his reputation for cowardice.

At Sartain's request, Montag drove Sartain and McKinney to Malibu, where, in a restaurant parking lot, McKinney drew his silencer pistol and said: "We want you to take us to Mickey Cohen." Sartain, who was also armed, handcuffed Montag with his hands behind his back; then McKinney said: "We're going to hit Mr. Cohen and you're going to help us." Sartain drove to Montag's apartment, where he handcuffed Montag to a towel rack in the bathroom. Cohen was in a San Diego hospital; a telephone call to the hospital failed to reach him. At gunpoint, Sartain took $200 in cash from Montag's bedroom closet and McKinney stuck the silencer pistol in Montag's face, threatening to go to the home of Montag's aged parents to "see what they have"; McKinney was wearing rubber gloves. There being no more money in the apartment, the three men went to Montag's office, where, under compulsion, Montag took 10 checks from his checkbook. They drove to a market where Montag cashed a check for $100, to a liquor store where he cashed a check for the same amount, to another market where he cashed a check for $50 and finally to a jewelry store in Beverly Hills, where Montag bought a $1,200 medallion for $1,000, paying for it with two $500 checks. Other attempts

to cash checks had been unsuccessful. The check transactions were confirmed by store personnel. Montag's state of fear was confirmed by an employee of the jewelry store, who remembered that he was so frightened he could barely sign the checks, his handwriting being like that of a child. In his terror, Montag left his driver's license at the jewelry store; it was mailed back to him. Before McKinney and Sartain left Montag, McKinney told him not to go to the police; if he did so they would kill him and kill his parents. Learning that Montag was going to his parents' house, Sartain telephoned Montag there, explaining that "Nelson" had left. Montag did not contact the police because he was afraid McKinney would come back and kill him even if Sartain were arrested. As mentioned earlier, McKinney flew back that night. He left with Sartain the guns, the wig, the mace, the walkie-talkies and the handcuffs.

According to Sartain, the money from Montag was split, the medallion was fenced, and its proceeds were divided with McKinney. It appears from the testimony of Montag and Sartain that McKinney scared Montag more than Sartain did. Several days later, afraid that McKinney would return, Montag offered Sartain money to kill the man he knew as Nelson. Sartain agreed to kill him for $2,500, $1,200 to be paid down. Montag borrowed $1,200 from his mother and gave it to Sartain on September 23d. A few days later Sartain told Montag that he had shot McKinney in a car in a field near San Francisco and had buried him in quick lime. Later, Sartain showed him a gun, implying that it was the murder weapon. Sartain then told Montag that he felt a "responsibility" toward him and offered him half the proceeds of a burglary in Fort Lauderdale, Florida; Sartain asked for and received $2,500 from Montag for "expenses" on October 1st. On October 7th, Montag gave Sartain another $1,000 for "expenses." Montag obtained both sums by selling stock options; his stock brokerage records confirmed the movements in his account. Montag testified that he felt completely in Sartain's power, having committed, as he believed, a gas chamber offense.

We now return to the NuWay. Commencing in March 1975, Chance had begun investing money with one Vanderpool; his investment grew to $100,000. In late September, Chance told Vanderpool that he would soon have another $100,000 to invest, explaining that the money was unreported income from a relative of his wife who lived in Denver and was involved in the Mafia.

The trial of Smaldone had been set for November 10th and Chance's name was on a witness list furnished to Smaldone by the prosecution. By

early October, Chance was momentarily expecting a shipment of $80,000 in syndicate funds; Loether knew this, and so did Sartain and Dee Watson. On October 8th, which was a Wednesday, Chance told Vanderpool that the money would arrive on Friday, the 10th, or Saturday; the 11th. Chance made an appointment to see Vanderpool the following Monday, explaining that only Loether and Mrs. Chance knew the money was coming in. On October 10th, the day after McKinney left Springfield for Los Angeles, Chance told a federal agent named Dowling that Loether and "some people from out of town" were planning to take over his business and that he was afraid "someone was going to murder him." Loether had gone to Florida, and Chance told Dowling that he might be "down there getting someone to set me up to kill me." Chance was a "heavy" whom Dowling had never seen in fear. On October 10th, however, he seemed "very upset."

The plan to rob Chance was formed by Loether and Sartain before McKinney's arrival; Dee Watson was aware of the plan. On the night of October 9th, Sartain told McKinney that they were to pick Chance up at the NuWay and take him home, where the money would be kept. On October 10th, Sartain told McKinney that Chance drove a Mercedes-Benz sedan and the two men went to a parking lot across from the lounge, where they observed the car, using two pairs of binoculars McKinney had brought with him from Illinois; Chance did not appear. Then they followed Mrs. Chance home in her own car and photographed the outside of the house, returning both to the NuWay and to the house the following day, Saturday, October 11th, in an effort to locate Chance. Jean Appel, who was granted immunity from prosecution, remembered seeing McKinney with binoculars, and recalled Sartain explaining that they were going "birdwatching"; her daughter Donna shared the same memories and also remembered McKinney trying on a wig. Jean further recalled having seen walkie-talkies, handcuffs and a silencer pistol at the house between McKinney's two trips to Los Angeles; Sartain told her McKinney had left the objects with him.

McKinney and Sartain returned to the NuWay at 11 a.m. on Sunday, October 12th, but Chance was still not there. Having obtained Loether's Florida telephone number from Dee Watson, they returned home, where McKinney talked to Loether and arranged to split Chance's money three ways. The two men left before 5 p.m., McKinney having arranged with Chance over the telephone to meet him at the lounge by pretending to be a friend of Loether's named Jim Stevens. McKinney was carrying a brief case; Donna Appel noticed the brief case and observed the finger of a

surgical glove sticking out of his back pocket; later that night, she was to see a pair of surgical gloves on her bedroom dresser. In his own testimony, McKinney denied having surgical gloves and denied ever having used gloves in committing a crime; in rebuttal, the People produced the victims of his 1953 and 1963 bank robberies; each testified that he wore a glove on his gun hand. McKinney also denied ever having used handcuffs. More will be said about this later.

Meanwhile, Mrs. Chance was at home preparing to have dinner with her elderly mother and her sister, Antoinette Urbaitis. Shortly after 6:30 p.m., Mrs. Chance received a call; Mrs. Urbaitis heard her say: "Herb, if you don't want to go, don't go." A few minutes later there was another call and Mrs. Chance repeated the same words, explaining to her sister: "That was Herb again, and he said he really didn't want to go to the airport, but it was all right, because these men were friends of Bob Loether."

The two calls occurred after McKinney and Sartain got to the NuWay. McKinney stayed in the car, while Sartain went inside. Dee introduced Sartain to Chance as "Sartino." Chance was drunk; when found dead his blood alcohol content was .22 and he had a blunt-force laceration in the midline of his forehead. Sartain told Chance he had a package for Loether and said that he wanted Chance to pick it up at the Los Angeles airport; Chance accused Sartain of being Stevens, which Sartain denied; a telephone call to Loether pacified Chance; McKinney entered the lounge and handed Sartain a gun; Dee Watson left; Sartain and Chance left at the same time in the latter's Mercedes, Sartain driving. According to one of Chance's employees, the departure occurred at 7:45 p.m.

The airport trip was, of course, a ruse. Instead of going to the airport, Sartain drove Chance in the opposite direction to a Holiday Inn motel on Sunset Boulevard near Westwood, McKinney apparently following in Sartain's car. There, McKinney entered the Mercedes, exhibiting the silencer pistol, while Sartain pulled out the gun McKinney had handed him earlier that evening. McKinney handed Sartain a pair of handcuffs and Sartain handcuffed Chance with his hands behind him. When Chance tried to pull away, McKinney struck him over the head with the silencer pistol; blood of Chance's blood type was later found on the dashboard of the car.

Upon arrival at the Chances' house, Mrs. Chance answered the doorbell and opened the doors. Her mother and sister had already left. As

the three men entered, Chance said to his wife: "That mother-fucker Bobby set us up." McKinney handcuffed Mrs. Chance with her hands behind her back; Sartain took $300 or $400 in cash from a pool table and a sack containing $63,000 from the kitchen; over $5,000 from the NuWay remained unnoticed and untaken from a safe; two diamond rings, a diamond-covered watch and a gold medallion were taken from Mrs. Chance; a diamond ring and a digital watch were taken from her husband. Chance asked Sartain, "Are you from the family?" Then McKinney shot Chance three times in the head at close range and shot Mrs. Chance twice in the left cheek at close range. The two men drove away in the Mercedes; each had been wearing rubber gloves. The time of the murders was established as between 9 and 10 p.m. A Mrs. Perry, the Chances' next-door neighbor, heard their telephone ring repeatedly between 10 and 10:10 p.m.; there was no answer; according to Mrs. Perry, the silence was unusual.

After leaving the scene, McKinney and Sartain drove to the Holiday Inn, where McKinney picked up Sartain's car and followed him home. Upon their arrival, McKinney reloaded the silencer pistol, handed it to Sartain and said: "You know, Dee has to go." Sartain said, "Yes." McKinney said, "You've got to do it," and Sartain said, "Okay."

As mentioned earlier, McKinney and Donna flew out just after midnight, their tickets having been purchased at 11:04 p.m. Before leaving the house, McKinney telephoned Clubb in order to obtain another gun. Sartain drove the Mercedes toward the airport, abandoned it en route near the Holiday Inn, and went the rest of the way with McKinney, Jean and Donna in his own car. When he and Jean returned home, Montag called, but Sartain did not talk to him. Sartain then drove to the NuWay, taking the brief case; the brief case contained McKinney's silencer pistol.

Next, Sartain telephoned Dee Watson at Loether's apartment, telling her that he was coming over to deliver a brief case containing $20,000 for Loether. Mr. Watson was there, and Dee told him what Sartain had said. Leaving with Dee's oldest child, Watson saw a man with a brief case in the apartment house garage. Reluctant to kill Dee in the presence of her younger children, who were sleeping on the floor, and whom he might awaken, Sartain led Dee from the apartment to a car registered to Loether, and had her drive him to a darkened residential street about a block from the NuWay. There, while sitting in the back seat, Sartain fired

eight shots at Dee; one missed; the other seven entered the back of her head.

The time of Dee's death was fixed at 1 a.m. by a neighbor who saw and heard Loether's car arrive and saw a man she could not identify running away from the car. Sartain walked to the NuWay, called a taxicab, and returned in the cab to Dee's apartment, where he retrieved his own car and drove home; records of the Checker Cab Company established that the call was placed at 1:22 a.m. and that Sartain was picked up at the NuWay at 1:30 a.m. Ballistics testimony established that the Chances and Dee Watson were killed with the same gun. Instructed by McKinney to "torch" the silencer pistol, Sartain tried the next day, but failed. Instead he buried it, together with three sets of handcuffs, a bottle of mace, some handcuff keys and some .22 caliber ammunition in a wash in the desert. As we have said, one of the handcuffs was of the same make as the two sets of handcuffs found in Garland, Texas. Sartain led the police to his treasure on May 19, 1976.

The bodies of Mr. and Mrs. Chance were discovered by Mrs. Urbaitis and Mrs. Perry on the morning of October 13th; Dee Watson's body was discovered in the early afternoon. Meanwhile, Sartain had telephoned Montag back and arranged to meet him at his office. There Sartain asked to borrow Montag's car to go to Florida to pick up the loot from the Florida burglary; Montag declined, explaining that his car was too old; the two men went to an automobile agency, where Montag rented a car for Sartain, introducing Sartain as his "associate"; Sartain was identified by an employee of the agency and the rental was confirmed by agency records. The car was abandoned in Jackson, Mississippi on October 24th. On October 25th, Sartain telephoned Montag, told him the police had contacted his mother, and asked him to find out whether he was wanted for killing Dee Watson. Montag did so, reported to Sartain that the police believed they had probable cause to arrest him, then, on October 27th, he telephoned the F.B.I., advising an agent that he had information about an escaped federal prisoner who was wanted for murder, and asking that his own name remain confidential. Upon later interrogation by the Los Angeles police, Montag was shown McKinney's photograph and learned for the first time that his tormentor was still alive. At first, Montag did not identify the photograph; ultimately he did; and, as mentioned earlier, he gave perjured testimony before the grand jury in A 323039, being unwilling to admit his guilt of conspiracy to commit burglary and conspiracy and solicitation to commit capital murder.

It is necessary at this point to follow Sartain's movements after October 13th in some detail. Travelling with Jean and Alice Appel to Jean's home in Belleville, Illinois, he met McKinney in Springfield on October 16th, returning the walkie-talkies; walkie-talkies were recovered by the police in June 1976 upon execution of a search warrant at McKinney's home. The two men met on October 17th at the St. Louis airport; McKinney told Sartain the police were looking for him and advised him to go to New Orleans to obtain another silencer pistol from Clubb. Sartain drove to New Orleans with Jean Appel; Clubb showed up with two other men; afraid of being killed, he did not talk to Clubb but returned to St. Louis, where he met McKinney at the airport on October 22d and exchanged $13,000 of Chance's money with money from a fence named Stratton. Then Sartain flew to Las Vegas with Jean Appel, marrying her there so that she could not testify against him. On October 25th, Sartain was back in Los Angeles, where, as we have said, he telephoned Montag. Then he bought a car and left town; the purchase was confirmed by other evidence.

As mentioned earlier, Sartain was arrested in St. Louis on March 28, 1976; this was less than a month after he committed a bank robbery in Houston, Texas. While in New Orleans over the Thanksgiving weekend, some men had tried to kill him. Telephoning friends in Florida, he learned that Borsellino was behind the attempt. After his arrest, he at first implicated a man named "Ted" in the murders, then told the police that Borsellino had committed them, obtained the indictment of Borsellino in A 327714 for capital murder through his own perjury, then told the police that a Paul Hammett or Paul Hammond had committed the murders, retracted that statement, testified at the trial that he delivered the $63,000 to Hammett in Los Angeles immediately after the killings, then admitted several days later on the witness stand that his testimony about Hammett was perjurious. We have already given Sartain's motive for his perjured testimony about Borsellino. Sartain testified that he wanted to blow the trial "sky high" and to turn it into a "carnival," hoping to secure for McKinney a hung jury or an acquittal by leaving a trail of prior inconsistent statements and testimony, hoping also to reap the benefits of his own plea bargain and sentence bargain while precluding his own assassination as an informer.

By the time he took the stand, Sartain had pleaded guilty in federal court to the Houston bank robbery and to escape but he had not yet been sentenced for them. In the present case, he pleaded guilty to the following four offenses: Conspiracy to murder Dee Watson, to kidnap and rob

Chance and to rob Montag; kidnaping Chance to commit robbery; the first degree murder of Dee Watson; and the first degree robbery of Montag. He was sentenced immediately to life imprisonment, the sentence to be concurrent with his existing federal sentences and to be served in federal prison, the prosecution to recommend to the federal authorities that his new bank robbery and escape sentences likewise be made concurrent and, if justice would thereby be served, made short. Asked what he did with the $63,000, Sartain testified that he gave McKinney his one-third share, spending the remaining $40,000 on "some cars, some broads; I done a little gambling, flew to Miami, went to Nassau, Freeport, and had a good time." Asked why he retained Loether's share, he replied: "He was the fat ass hole who put me dead in a murder beef, that's why."

We take leave of Sartain reading a note passed to him in county jail telling him to be careful because McKinney wanted him dead, and return to McKinney reading the indictment in A 323039 containing the names of Montag and Jean and Donna Appel on an attached witness list. We have already alluded to McKinney's plan to have them killed and will now describe the evidence relating to it.

On December 8, 1975, about six weeks after his arrest, McKinney told the F.B.I. that he wanted to help locate Sartain; he said he "would be most helpful by being released on bond, and stated that he had certain friends whom he thought were in a position to locate Sartain and who would not cooperate" with the bureau. On March 15, 1976, McKinney met Wendell Hall, an armed robber serving a prison sentence who was in county jail pursuant to a subpoena; the subpoena was a device to hold a gang meeting in the holding tank. Hall had a prison reputation for assaultiveness and, according to a prosecution witness, he was a member of the United White People's Party, an affiliate of a prison gang called the Aryan Brotherhood. Hall claimed to be a "hit man" for the brotherhood; one Childs testified that Hall was not a member of the brotherhood, while another witness, a former inmate named Witzig, testified that he had recommended Hall for membership.

Having been told that McKinney had a "heavy case with over 40 witnesses against him," Hall said: "All these people going to convict you?" and McKinney replied: "Well, really, not only three of them really bothers me." Overhearing McKinney telling another inmate that there were three people he would like to see "go home in a box," Hall said: "Is that right? Money talks." McKinney said: "Well, I got the money if you

got the people." Hall said: "Well, all right." McKinney offered Hall $2,500 to kill Montag, wrote Montag's name on a match book cover and gave Hall Montag's address. He told Hall to have Montag killed with a .22 caliber silencer pistol. Hall asked for $200 in advance and McKinney agreed to have his wife Vivian provide it; he described the two other victims as the wife and daughter of his "crime partner," a man named "Jerry," the price for their deaths being $2,500 each.

Cooperating with law enforcement because he had violated brotherhood rules and believed himself in danger, and obtaining in return a promise of placement in a prison security wing, Hall notified sheriff's deputies of his conversations with McKinney. A lady police officer named Patterson and an officer named Sirk began to monitor McKinney's plan, Patterson pretending to be Hall's girl friend and Sirk pretending to be a hired killer named Bobby. On March 29th, Mrs. McKinney dropped a freshly washed $100 bill in a Kleenex outside the jail; Officer Patterson picked it up and told Mrs. McKinney that she was supposed to deliver $200; the incident was recorded on videotape. After a series of conversations, some of which were tape recorded, Mrs. McKinney finally handed Officer Patterson two $50 bills near the TWA counter at the Los Angeles airport on April 6th, explained to her that it was no longer necessary to complete the task which Bobby had been hired to accomplish, and said that she was going back east with an attorney to contact witnesses and prepare her husband's defense. We have already given McKinney's explanation of his relationship with Hall. At one point in his testimony, McKinney said that he seriously considered having Montag killed. Almost in the next breath, he said: "I was scared to death, Mr. [prosecutor]. I strongly—the idea of killing Mr. Montag didn't occur to me because I didn't know anybody who could or would out in this area." Mrs. McKinney supported her husband's testimony that there was no fixed plan to kill any witnesses. When interviewed earlier by the police, she had denied that McKinney visited Los Angeles in September or October 1975.

I

■ One key to this case is the two pairs of Japanese handcuffs found in the Safeway shopping bag in McKinney's vacated apartment in Garland, Texas. They were of significance to the Garland police because several Safeway markets in the Dallas area had recently been robbed; the handcuffs were delivered to the F.B.I. to determine whether they had

been used in any recent local crimes and it was established that they had not been. But if Sartain was to be believed, McKinney placed his trademark upon the Montag kidnaping, the Chance kidnaping and the Chance murders by bringing handcuffs to Los Angeles, including one of the pairs which Sartain later buried, and by using them with Sartain to bind the hands of his three victims behind their backs. In his own testimony, McKinney denied ever having used handcuffs, denied having brought handcuffs to Los Angeles, and claimed that he saw Sartain with handcuffs.

Sartain being an accomplice, it was vital for the prosecution to corroborate Sartain and it was equally vital to the defense to deny the jury access to corroborating evidence. At the trial, the People exerted all their efforts to get the Garland handcuffs in; the defense did all it could to keep them out. The handcuffs were received in rebuttal; their admission is assigned as error; we find no error in their admission; indeed, it is impossible to invent a rational theory upon which they could have been excluded.

*People* v. *Peete* (1946) 28 Cal.2d 306 [169 P.2d 924], quotes the following principle: " 'The general tests of the admissibility of evidence in a criminal case are: . . . does it tend logically, naturally, and by reasonable inference, to establish any fact material for the people, or to overcome any material matter sought to be proved by the defense? If it does, then it is admissible, whether it embraces the commission of another crime or does not, whether the other crime be similar in kind or not, whether it be part of a single design or not.' " (28 Cal.2d 306, 315, and cases cited.) Insofar as it applies to evidence of other crimes, that principle has been refined in later cases. (See, e.g., *People* v. *Haston* (1968) 69 Cal.2d 233 [70 Cal.Rptr. 419, 444 P.2d 91].) But the possession of handcuffs is not a crime, and there was no evidence that the Garland handcuffs were themselves used in committing any crime. They were, however, of the same make as one of the accoutrements of death McKinney transported to Los Angeles on September 19th; they were not planted by Sartain; Sartain did not know and could not know that McKinney had left them in Garland; it would have been an unbelievable coincidence for Sartain to be guilty, McKinney to be innocent, and for Sartain to bury handcuffs of the same kind which McKinney had had in his possession 18 months before the kidnapings and murders. The handcuffs were telltale. In our view, they were properly received.

## II

█ McKinney says in his brief: "[T]he prosecution in the instant case has sought to deprive Appellant of his liberty until the day he dies . . . upon the basis of some of the most incredible testimony ever heard in the [*sic*] courtroom in this state. This Court should not sanction such an unjust result." We turn next to his contention that not even a dog should have been convicted on Sartain's evidence. The argument is a composite of assertions that as to count II (kidnaping Chance to commit robbery), Sartain was not corroborated as required by law, that as to count V (robbing Mrs. Chance), there was no evidence at all, and that as to each count Sartain's testimony was so inherently unbelievable that no verdict based upon it either in whole or in part should be permitted to stand.

If, however, Sartain were an incredible witness, the People would have been unable to corroborate him. But there was ample corroboration of his testimony. █ All that the law requires is evidence which "tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the witness who must be corroborated is telling the truth." (*People* v. *MacEwing* (1955) 45 Cal.2d 218, 224 [288 P.2d 257], and cases cited.) █ As to the offenses involving Montag, Sartain's testimony was corroborated by Montag's testimony, and if Montag be regarded as too debased a source to deserve much credence, Montag's testimony was itself confirmed by the documentary evidence of his transactions with McKinney and Sartain and the evidence of his fright when cashing the two $500 checks to purchase the gold medallion. With respect to the Montag kidnaping and the offenses involving Mr. and Mrs. Chance, we have already referred to the Garland handcuffs as strongly corroborative of Sartain's testimony. As to the kidnaping of Chance, as charged in count II, and the robberies of Mr. and Mrs. Chance, as charged in counts III and V, the fact that personal jewelry was taken from them both was sufficient to establish the corpus delicti of two offenses of robbery, and the evidence of Chance's bloodstains on the dashboard of his Mercedes and of the laceration on his forehead were sufficient to corroborate Sartain's testimony that after being duped into his car, Chance was taken to a motel in an opposite direction from the airport, struck over the head, then forcibly taken to a locked and barred fortress a number of miles away, where he and his wife were promptly robbed and murdered. The requirements of an aggravated kidnaping were clearly satisfied by this evidence. (*People* v. *Stephenson* (1974) 10 Cal.3d 652 [111 Cal.Rptr. 556, 517 P.2d 820]; *People* v. *Camden* (1976) 16 Cal.3d 808 [129 Cal.Rptr. 438, 548 P.2d 1110].)

If there be any residual doubt as to the sufficiency of the corroboration, and the force of the evidence in general, we need mention only the following: (1) Sartain testified that McKinney brought walkie-talkies to Los Angeles, and walkie-talkies were found in McKinney's home in Springfield; (2) Montag testified that McKinney was wearing rubber gloves on September 20th, Sartain testified that he and McKinney wore rubber gloves on October 12th, McKinney denied ever having used gloves in committing any offense, the victims of McKinney's 1953 and 1963 robberies testified that he wore a glove, Donna Appel saw him with a surgical glove on the evening of October 12th, and McKinney plotted to have Donna killed. It is almost superfluous to add that the defense was exposed as a fraudulent concoction and that McKinney also plotted to kill Montag and Jean Appel.

The law is well settled that the implied findings of a jury will not be disturbed by a reviewing court if they are supported by substantial evidence. (*People* v. *Newland* (1940) 15 Cal.2d 678 [104 P.2d 778].) A miasma of conflicting truths, half-truths and lies went to the jury under instructions as to credibility which are not questioned on the appeal. Having inspected a four-month trial through the lens of the court reporter, we find no basis for concluding that the jury went astray.

## III

The trial was arduous and hard-fought. The prosecution brought in witnesses from Illinois, New York and Texas; McKinney brought in witnesses from Illinois, Texas and Tennessee. During one three-month period, McKinney's counsel was paid $29,000 by the county; his investigator received nearly $6,000 in county funds. Every highway and byway were explored by the defense, often with minimal relevance. Sartain's testimony that he feared being killed in prison because of his "snitching" was countered by the testimony of a convicted rapist named Santos Aranda, who denied being affiliated with Nuestra Familia, that "snitches" were not killed in prison. The jury also heard James Harold Holiday, a convicted murderer accused of two more murders, reply "That's what's said" when asked if he led the Black Guerilla Family, heard him state that Sartain told him McKinney was innocent, and heard him distinguish learnedly between genuine "snitches," who should be killed, and ordinary liars, who should not. On many occasions, proceedings came to a halt while the defense made verbose offers of proof, consisting primarily of lengthy rearguments of evidentiary points that had already been decided. Both counsel interrupted one another, made

sarcastic remarks about each other, grinned at the jury when they thought they had achieved some legal or testimonial advantage, and each went repeatedly to the bench to accuse the other of the same sort of silly and inconsequential misconduct he had himself engaged in. Confronted by a trial of inordinate length, by a flamboyant, gesticulating prosecutor and by a persistent, humorless defender for whom even the smallest matter was "critical," the court lost its equanimity and made quite a number of curt and abrupt remarks, about equally divided among them, the curtness and the most abrupt being to turn the jury "over to the tender mercies" of the prosecutor at the commencement of final argument. But we are told at length and with some heat that the court was biased against the defense and engaged in prejudicial misconduct requiring a reversal of the judgment. Our reading of 8,000 pages of transcript convinces us that there is no substance to the contention.

It is unnecessary for us to go through each separate assignment of error, and there is only a handful, place each in its context, and either explain that what the court said and did was within its undoubted power to control the proceedings in its own courtroom, or excuse the court for being somewhat sharper than Solomon. But one statement by the court, uttered under considerable provocation, requires treatment at length.

A Mrs. Leonard had testified that McKinney and Sartain teased Donna Appel on October 12th. On cross-examination, counsel proposed to ask her whether she told the defense investigator, a lawyer named Ellis, that Donna provoked the teasing. There was an objection; the objection was discussed at the bench; voices were raised, possibly the court's voice. After a recess, the court went into chambers with both attorneys, the court stated that it had not been angry at the bench, McKinney's lawyer said that the court had indeed been angry and demanded from the court a specific admonition to the jurors to disregard what they might have heard from the bench, the court refused to give the admonition, then the following happened, which we quote *in extenso*:

"MR. EPSTEIN: Well, I will testify and I'm sure Mr. Ellis will testify under oath that Your Honor was angry at the time.

"THE COURT: I don't want to have—I will fire him as an investigator of this case if his purpose is to go around and try to get damaging statements from other witnesses so he can be a witness in this case. I'm telling you this right now.

"MR. EPSTEIN: Your Honor, an investigator's purpose is to talk to witnesses—

"THE COURT: He's not to become a witness in the case if he's been paid by the county as an associate of yours.

"MR. EPSTEIN: He is not being [paid] as an associate of mine. He's being paid as an investigator.

"THE COURT: I'll terminate his services.

"MR. EPSTEIN: Pardon me?

"THE COURT: I will terminate his investigation.

"MR. EPSTEIN: For what purpose?

"THE COURT: For the purpose of going around interviewing a lot of people, then getting on the stand later on to contradict things which they said.

"MR. EPSTEIN: I am completely at a loss.

"THE COURT: I'm not at a loss. I know what he's being hired for.

"MR. EPSTEIN: That's what an investigator does.

"THE COURT: He is to investigate and give you information, not get on the witness stand and testify.

"MR. EPSTEIN: An investigator is not hired to listen?

"THE COURT: I don't want him here for that purpose. I told you that.

"MR. EPSTEIN: When did you tell me that?

"THE COURT: I'm telling you that. I am saying I can terminate his employment anytime I want. If his purpose is to go around and interview a lot of people so he can get on the witness stand and contradict what they say—

"MR. EPSTEIN: What do you mean by supposed—

"THE COURT: Supposedly contradicting what they say.

"MR. EPSTEIN: Your Honor, if a witness says one thing on the stand—

"THE COURT: I don't want to talk about it any further. Let's forget about that."

■ The foregoing was highly improper. It bears only one interpretation: A direct order to the defense not to call its investigator to the witness

stand to impeach any witness who may have made to him a statement inconsistent with the testimony of that witness. In our view, it was tantamount to an order to the defense that it could not present a defense, and is as vulnerable to constitutional attack as the Georgia statute precluding an accused from testifying under oath in his own behalf that was cast out in *Ferguson* v. *Georgia* (1961) 365 U.S. 570 [5 L.Ed.2d 783, 81 S.Ct. 756], as a violation of the due process clause of the Fourteenth Amendment. If the order had been acted upon, it would be a struggle for us to structure a theory of harmless error that could save McKinney's convictions. But it was *not* acted upon. Ellis took the stand to contradict the testimony of Mrs. Maero by statements she allegedly made to him during an interview and he was the last witness the jury heard. Under the circumstances, McKinney clearly suffered no harm, and in view of what has been said, we attribute the court's remarks to exasperation rather than bias. We mention the incident for three reasons: First, because it occurred and manifestly should not have occurred; second, because McKinney places it first in his brief, advancing it as his most important ground for reversal; third, because McKinney's appellate counsel, who was also his trial counsel, did not tell us in his brief that Ellis testified, and the Attorney General did not tell us either; we had to discover that fact for ourselves.

IV

We next dispose summarily of a number of disparate contentions which do not require extended treatment.

1. The court properly denied McKinney's motion for a postindictment preliminary hearing. *Hawkins* v. *Superior Court* (1978) 22 Cal.3d 584 [150 Cal.Rptr. 435, 586 P.2d 916], which first established that right, does not apply retroactively. (22 Cal.3d 584, 594.)

2. ■ The wig found with the handcuffs in Garland, Texas was destroyed by the Garland police. The wig was photographed and photographs were exhibited to the jury over objection based upon *People* v. *Hitch* (1974) 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361]. Whether or not *Hitch* applies to destruction of items by out-of-state police, evidence of the wig was clearly admissible. The jury could look at the pictures and decide for itself whether the wig fit McKinney, but even if the wig did not fit him, the point of the proof was his possession of disguises, whether intended for him to wear or for another to wear instead.

3. On cross-examination, a federal agent named Malone was asked whether: "To your knowledge, has the FBI attempted to find any evidence whatsoever that connects George McKinney with organized crime?" and the People's objection was sustained. The ruling is assigned as error, but in making the assignment, McKinney overlooks the evidence of his own offer to the F.B.I., if released on bail, to find Sartain through "certain friends" who "would not cooperate" with law enforcement, among them one "Ju-Ju" whom McKinney had met in federal prison and believed to be a former member of the Mafia.

4. ▮ Sartain and his lawyer testified at length about the former's plea bargain and sentence bargain. Sartain owed 15 years minimum remaining on his federal sentences and owed the state a minimum of 8 years, 10 months upon his convictions in this case, both to be served concurrently. McKinney offered to prove through the lawyer's testimony that Sartain would not "have to serve in all probability one extra day in custody because of the State murder charges" since the state and federal minima were concurrent. The court rejected the offer of proof, stating that the subject was one for jury argument. We agree. Bearing in mind that Sartain's federal term had a "closed top" and his California sentences a "life top," the lawyer's opinion would have been pure speculation.

5. After the Garland handcuffs were admitted in evidence, McKinney sought approval to send his investigator Ellis to Garland at county expense to see if there were any persons whom McKinney had robbed while he was there who could testify he did not use handcuffs or a disguise in robbing them. This preposterous and self-defeating request was properly refused.

6. The People advised McKinney just before he took the stand that they were checking out conflicting statements made by the Nabors brothers and would turn over the results of their investigation within "two days or so." McKinney demanded an immediate "suppression of evidence" hearing. The court refused to hold a hearing, but ordered the prosecution to provide discovery as soon as the investigation was completed. The matter was never again mentioned; we presume the order was complied with; there was no violation of McKinney's right to discovery. (*People* v. *Manson* (1976) 61 Cal.App.3d 102, 145 [132 Cal.Rptr. 265].)

7. Sartain refused to name the narcotics courier whom he and McKinney set out to rob and kill on September 20th and the persons in Florida who told him Borsellino had plotted his death; Hall refused to name the persons he claimed to have killed while in prison. One William McKinney testified for the defense that Hall was not a member of the Aryan Brotherhood, but when he refused to name other members of the brotherhood, his testimony was stricken on the People's motion; defense motions to strike the testimony of Hall and Sartain were denied. McKinney says it was unfair to strike his namesake's testimony and not to strike the testimony of Sartain and Hall. We find no unfairness. The next defense witness, one Childs, testified without objection that Hall was not a member of the brotherhood.

8. ■ At the end of the trial, McKinney sought approval to bring Jean Appel's sister, Diane Daenzer, from Belleville, Illinois at county expense, representing that Diane would testify to having seen Sartain with a piece of luggage bearing an identification with a false name and the address of Montag's mother while he was "on the run" after the Chance and Watson murders. The purpose of calling Diane was to show a "close" relationship between Montag and Sartain. There was no abuse of discretion in denying the request. Diane's testimony would have been merely cumulative to Montag's testimony that Sartain had his parents' telephone number and to the testimony of both Sartain and Montag that Montag paid Sartain $4,700 and rented a car for him to get him to kill McKinney and help him to commit burglary.

9. ■ The court committed error in including kidnaping to commit robbery, together with robbery and burglary, in its statement of the inherently dangerous offenses included within first degree felony murder. (Pen. Code, § 189.) Yet the jury convicted McKinney not only of kidnaping Chance to commit robbery, but also of robbing Mr. and Mrs. Chance, and of the burglary of their residence. It is inconceivable that the jury could have concluded that McKinney kidnaped Chance to commit robbery while also concluding that he was innocent of the two robberies and of the burglary. The error was not and could not have been prejudicial. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], and cases cited.)

V

■ Even though we are satisfied that the evidence fully establishes McKinney's guilt of kidnaping Montag to commit robbery (count XVI)

and the first degree robbery of Montag (count XVII), we are nonetheless obliged to reverse the judgment upon those counts and to order them dismissed.

This is what occurred. As we have said, McKinney and Sartain were charged in the earlier indictment, A 323039. On June 14, 1976, Sartain pleaded guilty to the counts we have previously mentioned, and on June 16, 1976, the grand jury presented the second indictment, A 327714, which was filed on that date. At McKinney's insistence, the People moved to dismiss the first indictment and the motion was granted. The second indictment, as mentioned earlier, eliminated Sartain as a defendant and added Loether and Borsellino. Counts X and XI of A 323039 charged McKinney and Sartain with kidnaping Montag to commit robbery and robbing Montag; A 327714 did not contain those charges.

The record does not disclose when the omission was discovered. All we can tell is that on November 4, 1976, 3,000 transcript pages into the presentation of the People's case, the People filed a motion to set aside the dismissal of counts X and XI of A 323039 or, in the alternative, to amend the later indictment by adding former counts X and XI as new counts XVI and XVII. The motion was supported by the prosecutor's affidavit that his "secretarial staff" did not comply with the "complicated but definitive instructions" he gave as to the charges to be typed up, and that the grand jury "assumed" the two counts were included; the omission was attributed to "clerical and ministerial" error. The motion was opposed, and over vigorous objection, the dismissal of counts X and XI was set aside and those two counts were incorporated or "consolidated" into A 327714 as counts XVI and XVII.

McKinney relies on section 1009 of the Penal Code, which deals with amendments to accusatory pleadings. The statute explicitly states: "An indictment or accusation cannot be amended so as to change the offense charged. . . ." In this connection, we must say that the addition of two new counts to A 327714 was obviously a "change" in the offense charged. Indeed, if adding two counts, one of which carried a penalty of life imprisonment, did not "change" the offense charged against McKinney, we cannot conceive of *any* amendment to *any* indictment that would. *Owen* v. *Superior Court* (1976) 54 Cal.App.3d 928 [127 Cal.Rptr. 1], is controlling upon the point.

The Attorney General says in his brief that there was nevertheless no error because the grand jury which returned A 323039 was the *same*

grand jury which returned A 327714, and that the act of setting aside the dismissal of counts X and XI and sticking them into A 327714 as counts XVI and XVII was proper because that grand jury had already accused McKinney of kidnaping Montag and robbing him. The argument is attractive, but we are compelled to reject it. A grand jury votes in secret; we simply have no means of knowing whether this grand jury *revoted* to accuse McKinney of the two counts in question, and there is nothing in the record, either in the affidavit of the district attorney or otherwise, to establish either that the grand jurors had done so by the time the prosecutor's secretaries had completed their typing, or that they did so afterwards.

An indictment is a formal accusation which a grand jury is required to "present" to the court and it must be filed with the clerk pursuant to law. (Pen. Code, § 944.) The indictment in A 327714, omitting the two counts, was solemnly endorsed as a "true bill" by the foreman of the grand jury and was solemnly presented in open court under the signature of the foreman, the signature of the prosecutor, and the signature of a deputy county clerk. We turn next to the argument of the Attorney General that Penal Code section 1009 should be disregarded in this case.

We begin by noting that there is no equity whatsoever in the People's position. The functions of the grand jury as an indicting body have been under constant attack during recent years, the criticism culminating in *Hawkins* v. *Superior Court, supra,* 22 Cal.3d 584. Had *Hawkins* been decided a few years earlier, McKinney would have been entitled, as a matter of right, to a postindictment preliminary hearing. Had *Hawkins* never been decided, this case might well have been the one to invite and invoke the *Hawkins* principle. Through plausible perjury which deceived even the prosecutor, Sartain procured the indictment of Borsellino, an innocent man, on capital charges. The prosecutor sent the typed indictment in A 327714 to the grand jury without reading it. Assuming that the grand jury voted to reindict McKinney for the two Montag offenses, no member of the grand jury read the indictment before it was endorsed, presented and filed. Certainly, the prosecutor did not read it before he signed it himself.

The record does not disclose whether A 327714 was read out to the jury or whether its contents were merely summarized. In either event, it is possible that no one was listening. Both counsel made opening statements at the outset of the case, the prosecutor stating, without reference to any specific count in the indictment, that he would prove that McKinney

kidnaped Montag and robbed him, defense counsel replying without reference to any specific count that he would prove the contrary. Both lawyers may have made their opening statements knowing that the indictment did not contain the two counts, the prosecutor saving his motion to bring in counts X and XI of A 323039, the defense saving its statutory argument. This, however, we do not know, and probably we shall never know.

All that we *do* know is that the Attorney General relies upon an ancient maxim of jurisprudence. "For every wrong there is a remedy." (Civ. Code, § 3523.) But there is *no* wrong in this case, only a major blunder whose consequences should fall upon the party who made it. The People obtained the first indictment for their own purposes; they obtained a new one when the first one no longer served their purposes. If any maxim applies to this case, it is this one: "He who takes the benefit must bear the burden." (Civ. Code, § 3521.)

The Attorney General says last that adding the two charges was within the "inherent powers of the judiciary." He urges that there is no constitutional or statutory prohibition against setting aside the dismissal of counts X and XI, while McKinney replies that there is no constitutional or statutory authority permitting it. We resolve the matter as follows: Whatever the inherent powers of the trial court, and of this court, they do not extend to the resurrection of the dead.

We close by quoting from an old opinion, *People* v. *Rodriguez* (1943) 58 Cal.App.2d 415, at pages 424-425 [136 P.2d 626]: "We find particularly appropriate in this connection remarks of former Chief Justice Bleckley of the Supreme Court of Georgia, delivered to the Georgia Bar Association and printed in its annual report (1886) as follows: 'Some meritorious cases, indeed many, are lost in passing through the justice of procedure; but they are all justly lost, provided the rules of procedure have been correctly applied to them. That a just debt is unrecognized, a just title defeated, or a guilty man acquitted, is no evidence that justice has not been done by the Court or the jury. It may be the highest evidence that justice has been done, for it is perfectly just not to enforce payment of a just debt, not to uphold a just title, not to convict a guilty man, if the debt, or the title, or the guilt be not verified. It is unjust to do justice by doing injustice. A just discovery cannot be made by an unjust search. An end not attainable by just means is not attainable at all; ethically, it is an impossible end. Courts cannot do justice of substance except by and through justice of procedure. They must not reach justice

of substance by violating justice of procedure. They must realize both, if they can, but if either has to fail, it must be justice of substance, for without justice of procedure Courts cannot know, nor be made to know, what justice of substance is, or which party ought to prevail. As well might a man put out his eyes in order to see better, as for a court to stray from justice of procedure in order to administer justice of substance.' "

For the foregoing reasons, we have determined that the convictions on counts XVI and XVII must be reversed and those counts dismissed. We are not, however, required by this conclusion to disturb the judgment upon any other count. All the evidence relating to the kidnaping and robbery of Montag was also relevant to the properly filed charges of assaulting him, conspiracy to assault him and conspiracy to murder him and the evidence of the kidnaping and the robbery was elicited during the presentation of the People's case without any objection by the defense that it was not relevant to those charges.

## VI

On October 12, 1975, and continuing until July 1, 1977, the statutory penalty for kidnaping to commit robbery with bodily harm was either death or life imprisonment without the possibility of parole. Effective July 1, 1977, Penal Code section 209 was amended to provide a penalty of life imprisonment with the possibility of parole, whether bodily harm was inflicted or not. (Stats. 1976, ch. 1139, § 136.5.) McKinney was tried, convicted and sentenced under the old statute. He contends that his punishment on count II must be modified to life with the possibility of parole because of the 1976 amendment. We disagree.

Absent compelling proof of a specific legislative intent that a statute reducing the punishment for an offense is only to apply prospectively, such a statute applies retroactively to all convictions lacking finality at the time of the effective date of the ameliorating law. (*In re Estrada* (1965) 63 Cal.2d 740 [48 Cal.Rptr. 172, 408 P.2d 948]; see, also, *In re Kapperman* (1974) 11 Cal.3d 542, 546 [114 Cal.Rptr. 97, 522 P.2d 657].)     Conceding sub silentio that there was no "savings clause" in the 1976 statute, the Attorney General argues, however, that under an even newer statute, enacted by the People on November 7, 1978, the electorate expressed its intention that "if a kidnapping takes place in violation of section 209 of the Penal Code in the course of a first degree murder, the penalty should be life without the possibility of parole and not life with the possibility of parole."

The People's argument is based upon the 1978 Penal Code section 190.2, subdivision (a)(17)(ii), which provides in essence for a penalty of death or life imprisonment without the possibility of parole for first degree murder upon a finding of "special circumstances" that "The murder was committed while the defendant was engaged in or was an accomplice in the commission of, attempted commission of, or the immediate flight after committing or attempting to commit . . . [k]idnapping in violation of Sections 207 and 209." Here, the jury returned two verdicts of first degree murder and its verdict finding McKinney guilty of the aggravated kidnaping of Chance on the evidence adduced at trial was legally the equivalent of an explicit finding of a "special circumstance" that McKinney murdered Chance while "engaged in" kidnaping him in violation of section 209.

In this distinctive case, which is unlikely to have fellows, four consecutively enacted statutes prescribing a penalty for the same criminal conduct potentially apply: (1) the statute under which McKinney was lawfully tried and lawfully convicted upon count II and which fixed his punishment as life imprisonment without the possibility of parole; (2) the 1976 statute, which, if applicable to him, would reduce his punishment upon count II to life imprisonment; (3) a 1977 statute (Stats. 1977, ch. 316, § 9) upon which the Attorney General no longer relies, and which, if applicable to McKinney, would fix his punishment upon count II at life imprisonment without possibility of parole upon a finding of a "special circumstance" that McKinney committed a "willful, deliberate and premeditated" first degree murder, reliance upon it being useless because the jury could, under the court's instructions, have found McKinney guilty of the first degree murder of Chance by applying the felony-murder rule without specifically finding that he committed premeditated murder; (4) the present statute which evidences an electoral intent having the force of a legislative intent to hold fast to the penalty originally and lawfully imposed. The will of the People seems clear. Life without possibility of parole is not an unconstitutional punishment for kidnaping to commit robbery with bodily harm. (*People* v. *Isitt* (1976) 55 Cal.App.3d 23 [127 Cal.Rptr. 279]; see *In re Maston* (1973) 33 Cal.App.3d 559 [109 Cal.Rptr. 164].) Still less should it be so when the victim dies as Chance died, pursuant to a carefully executed plan. There is accordingly no injustice and no unfairness in holding, as we do, that the 1978 statute, operative long prior to the finality of this judgment, restored McKinney's original punishment. We have carefully read *People* v. *Teron* (1979) 23 Cal.3d 103 [151 Cal.Rptr. 633, 588 P.2d 773]; *Teron* does not require us to hold to the contrary; we decline to reduce the penalty upon count II.

## VII

Minor sentencing modifications are, however, required. By amended commitment, the court ordered McKinney's sentence upon count II to run consecutively to his federal sentences. That order was apparently unauthorized. (See *People* v. *Sewell* (1978) 20 Cal.3d 639 [143 Cal.Rptr. 879, 574 P.2d 1231].) In addition, the court included in the judgment sentences based upon findings that McKinney was armed at the time he committed counts II, III, V and VI, but there were no armed allegations as to those counts.

## VIII

Two things remain to be said:

(1) The prosecution should not prepare as charges so many alternative statements of the same offenses that it cannot keep track of them; and

(2) Montag's conduct as disclosed by this record should be referred to the State Bar of California for whatever action it deems appropriate.

## IX

The judgment upon counts XVI and XVII is reversed and those counts are ordered dismissed. With respect to count II, we modify the judgment by striking the sentence imposed upon the armed allegation and ordering that McKinney's sentence upon that count run concurrently with his federal sentences. As so modified, the judgment upon count II is affirmed. With respect to counts III, V and VI, we modify the judgment by striking the sentences imposed upon the armed allegations and affirm the judgment upon those counts as so modified. The judgment upon counts I, IV and X is affirmed.

Lillie, Acting P. J., and Hanson, J., concurred.

A petition for a rehearing was denied August 30, 1979, and appellant's petition for a hearing by the Supreme Court was denied September 26, 1979.