[Crim. No. 39402. Second Dist., Div. One. Dec. 21, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES LEROY NOBLE, Defendant and Appellant.

**COUNSEL**

Dennis L. Cava, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**LILLIE, Acting P. J.**—Defendant Noble was tried with Raymond Howard for the murder of Deputy Barthel. A jury acquitted Howard

but found defendant guilty of first degree murder and to be true certain special circumstances[1] (count I), felonious assault (count II) and attempted murder (count III), and to be true the personal firearm use allegations as to each count. He appeals from the judgment.

On April 19 between 7:30 and 8 p.m., Deputy Hollingsworth was injured and Deputy Barthel was shot to death while they were in the process of arresting Clarence Howard, brother of codefendant Howard, and investigating defendant's conduct of throwing to the ground a bottle containing PCP. Each deputy wore the uniform of a deputy sheriff and rode in a sheriff's black and white vehicle.

On patrol, the deputies had observed a group of half a dozen black men standing on a corner which they knew to be a location for criminal activity. The group watched the deputies; Clarence separated from the others and as he walked away he dropped to the grass a bottle containing PCP; Clarence was apprehended by Deputy Barthel and taken to the sheriff's vehicle. Deputy Hollingsworth continued to watch the group and two men break away from it; one of those walking away from the group was defendant whom he and Barthel knew from a prior arrest; as defendant walked he dropped a bottle into a shrub area; he (Hollingsworth) walked over and retrieved it; the bottle contained PCP; at that point he glanced up and saw two people one of whom was defendant. Deputy Hollingsworth then had a conversation with Deputy Barthel about the bottles and defendant, and he decided to go to the radio car and request a backup unit before going to defendant's apartment.

Just as he started for the vehicle, Deputy Hollingsworth heard the crack of a bullet near his head followed immediately by the report of a small caliber weapon; he turned to warn Barthel then heard another crack immediately followed by a shot from a small caliber weapon; Deputy Barthel yelled "They are shooting at us"; he started toward Barthel then heard a third gunshot and was knocked down to one knee; he thought he had been hit in the side; gasping for breath he got back to his feet and was trying to move toward Barthel who yelled "I am hit, I am hit bad" and began to stagger and stumble; he heard five more

[1]Deputy Barthel while engaged in the performance of his duties was intentionally killed; and the murder was committed in retaliation for the performance of his official duties.

shots in rapid succession then lost count; the shots appeared to come from a .22 caliber; he ran to Barthel and tried to pull him out of the area. At this time Deputy Hollingsworth saw Clarence in front of the radio car and pointed his revolver at him; Clarence showed his hands which were empty and shook his head saying "It's not me"; Clarence was running backwards, and he had to let him run; he and Deputy Barthel were on their knees and blood was running out of the deputy's mouth. Deputy Hollingsworth then looked up and saw two men 12 to 15 feet in front of him; there was one distinct muzzle flash; he pointed his service revolver at them over Barthel's right shoulder at which time he saw a flash directly in front of him; the face of defendant was directly beyond the flash and defendant was one of the two men firing; the other man was codefendant Howard. Deputy Hollingsworth crawled on all fours to the radio car and called for assistance; he returned to Deputy Barthel and the shots continued; at that time Deputy Barthel was either dead or dying.

Various witnesses saw the deputies arrive and apprehend Clarence, heard the shooting and saw the deputies fall wounded. One witness saw the deputies search Clarence then defendant go into his house and come out with a rifle and join another man. Two witnesses saw defendant shoot the deputies with a rifle and the deputies fall. Another was in her apartment with codefendant Howard when defendant came in and said "Ray, the police has your brother," whereupon Howard got up and left.

Immediately after the shooting a .22 caliber rifle cleaning kit was found in defendant's apartment nearby; shortly thereafter defendant was arrested in the park. After he had been advised of his constitutional rights and waived the same, he first denied he "killed the cop" but admitted possession of a .22 caliber rifle. The next time he talked to the deputies he said he started to walk across the street to watch the deputies talk to Clarence when he heard gunshots and ran. A day later he told Sergeant Dorris he saw Clarence stopped by police in front of his house and when he saw "this guy go down" he ran around to the back of his apartment, got a .22 automatic rifle then positioned himself behind a brick wall where he fired one shot then ran.

Defendant testified that he heard a big commotion outside and several gunshots and left with his brother out the back door of his apartment and went to a liquor store; when they returned he stood up against the wall and asked some people what had happened. He denied shooting anyone.

The issue framed by appellant is whether the penalty of life imprisonment without possibility of parole for persons convicted of first degree murder where a special circumstance has been specifically found to be true, imposed without providing for consideration of mitigating circumstances and special guidelines therefor, is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the federal Constitution.

The jury returned a verdict of first degree murder and specifically found to be true two alleged special circumstances, i.e., the victim was a peace officer who, while engaged in the performance of his duties, was intentionally killed; and he was intentionally killed in retaliation for the performance of his official duties. (See § 190.2, subd. (a)(7), Pen. Code.) Thereafter, on the penalty trial the jury fixed the penalty as "life without possibility of parole." Subsequently defendant was sentenced to the state prison for the term of life without possibility of parole. (§ 190.2, Pen. Code.)

Appellant attacks the constitutionality of section 190.2, Penal Code on the ground that it provides that the penalty of life imprisonment without possibility of parole is mandatory in every instance[2] of first degree murder with one or more special circumstances found to be true irrespective of mitigating circumstances, and that this runs contrary to United States and California Supreme Court authorities that in sentencing, justice requires consideration of more than the acts committed, the surrounding facts of the offense and particular factors relating to the offender should also be considered. Appellant argues that the same mitigating circumstances enumerated in section 190.3, Penal Code to be considered by the jury in determining whether to impose the death penalty "should be considered by the jury in determining whether to impose a straight life sentence or life without the possibility of parole." Appellant's position lacks merit.

First, appellant's argument is based on the false premise that a "straight life sentence" is a possible penalty for first degree murder where one or more special circumstance is found to be true. There is no provision in the Penal Code for the imposition of "straight life" impris-

---

[2]Reading this literally, we comment that the penalty of life imprisonment without possibility of parole is not, as urged by appellant, mandatory "in every instance" of first degree murder where one or more special circumstance is specifically found to be true. Section 190.2, Penal Code gives the trier of fact the option of fixing the penalty at death or confinement in the state prison for a term of life without possibility of parole.

onment in such a case, thus, consideration of such a penalty would never come before the jury. Second, we do not believe that the penalty of life imprisonment without possibility of parole for the intentional murder with malice aforethought of a police officer in the performance of his official duties and in retaliation therefor "is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity" (*In re Lynch* (1972) 8 Cal.3d 410, 424 [105 Cal.Rptr. 217, 503 P.2d 921]) as to constitute cruel and unusual punishment. (Art. I, § 17, Cal. Const.)

Punishment for first degree murder is "death, confinement in state prison for life without possibility of parole, or confinement in the state prison for a term of 25 years to life. The penalty to be applied shall be determined as provided in Sections 190.1, 190.2, 190.3, 190.4, and 190.5" (§ 190, Pen. Code). If the trier of fact finds defendant guilty of murder first degree, it shall at the same time determine the truth of all special circumstances charged (§ 190.2, Pen. Code); if it specifically finds the special circumstance alleged to be true, the penalty "shall be death or confinement in state prison for a term of life without the possibility of parole . . . ." (§ 190.2, Pen. Code.) Thus it is clear that by the time the trier of fact has found defendant guilty of first degree murder and specifically found one or more alleged special circumstances to be true, a "straight life" sentence is no longer a possible penalty. The only possible penalty provided by law is death or life imprisonment without possibility of parole. Under these circumstances the trier of fact at the penalty trial can be and is concerned only with which of these two penalties to impose; its duty is clear under section 190.3, Penal Code—it shall fix the penalty at death if it concludes that the aggravating circumstances outweigh the mitigating circumstances, and life imprisonment without possibility of parole if it determines that the mitigating circumstances outweigh the aggravating circumstances. Under California law no choice between "straight life" and life imprisonment without possibility of parole is afforded the trier of fact; thus, there would be no reason to consider mitigating circumstances, and this is consistent with the intent of the electorate in approving Proposition 7 (§§ 190 through 190.5, Pen. Code).

The predecessor statute (§§ 190 through 190.5) was repealed and new identically numbered sections were added to the Penal Code by the electorate pursuant to an initiative measure (Prop. 7) approved by the General Election of November 7, 1978. In examining the predecessor statutes and the initiative measure, it is obvious that the main purpose

of the initiative statute was to increase the penalties for certain serious crimes—change and expand categories of first degree murder for which penalties of death or confinement without possibility of parole may be imposed, change minimum sentence for first degree murder from life to 25 years to life and increase penalty for second degree murder. (See summary prepared by Attorney General, Ballot Pamp., Gen. Elec. (Nov. 7, 1978) p. 32.) When an enactment follows voter approval, the ballot summary, arguments and analysis presented to the electorate in connection with a particular measure are helpful in determining the meaning thereof. (*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 245-246 [149 Cal.Rptr. 239, 583 P.2d 1281].) Here the legislative analysis of the initiative statute points up, among other things, the purpose of Proposition 7 to "(1) increase the penalties for first and second degree murder, (2) expand the list of special circumstances requiring a sentence of either death or life imprisonment without the possibility of parole, and (3) revise existing law relating to mitigating or aggravating circumstances." Specifically, "the proposition would make the death sentence *mandatory* if the judge or jury determines that the aggravating circumstances surrounding the crime *outweigh* the mitigating circumstances. If aggravating circumstances are found *not* to outweigh mitigating circumstances, the proposition would require a life sentence without the possibility of parole." (Ballot Pamp., *supra*, p. 32, original italics.)

From the foregoing comments found in the Ballot Pamphlet, a comparison of the predecessor statute and the initiative measure demonstrating various changes—the deletion of "confinement in the state prison for life" in the predecessor statute (§ 190) from the initiative statute, the retention of the mandatory language of section 190.2 that the penalty for first degree murder "shall" be death or confinement in state prison for a term of life without the possibility of parole in any case in which one or more charged special circumstance has been specifically found to be true, and the addition of the language, "or the victim was a peace officer as defined in the above enumerated sections of the Penal Code, or a former peace officer under any of such sections, and was intentionally killed in retaliation for the performance of his official duties" (§ 190.2, subd. (a)(7))—and the clear mandate of the electorate that more severe punishments be imposed for first degree murder, compel the conclusion that the electorate never contemplated that a sentence of "straight life" be imposed for first degree murder where one or more special circumstances have been specifically found to be true, and that it intended to punish one who intentionally murders

with malice aforethought a police officer in the performance of his official duties and in retaliation therefor, with death or life imprisonment without possibility of parole. The will of the people seems clear. (*People v. McKinney* (1979) 95 Cal.App.3d 712, 746 [157 Cal.Rptr. 414].)

Appellant does not contend that the penalty of life imprisonment without possibility of parole is cruel and unusual punishment per se. He urges that it constitutes cruel and unusual punishment even though mandated by section 190.2, subdivision (a)(7), Penal Code, when imposed irrespective of mitigating circumstances. In light of the foregoing discussion we deal only with whether life imprisonment without possibility of parole is cruel and unusual punishment in the context of the instant charge.

First, the Legislature may properly limit the discretion of the trial judge by enacting mandatory provisions for punishment. (*People v. Tanner* (1979) 24 Cal.3d 514, 520 [156 Cal.Rptr. 450, 596 P.2d 328] [re use of firearms during commission of specified offenses].) The selection of the proper penalty for a criminal offense is a legislative function "involving an appraisal of the evils to be corrected, the weighing of practical alternatives, consideration of relevant policy factors, and responsiveness to the public will; ..." (*In re Lynch* (1972) 8 Cal.3d 410, 423 [105 Cal.Rptr. 217, 503 P.2d 921].) The mandatory language of section 190.2 was retained in the initiative statute.

Second, the court in *People v. McKinney* (1979) 95 Cal.App.3d 712 [157 Cal.Rptr. 414], a case of kidnaping in which the victim died, followed *People v. Isitt* (1976) 55 Cal.App.3d 23, 31 [127 Cal.Rptr. 279] and *In re Maston* (1973) 33 Cal.App.3d 559, 565-566 [109 Cal.Rptr. 164], which hold that life imprisonment without possibility of parole is not an unconstitutional (cruel and unusual) punishment for kidnaping for robbery with bodily harm; and said at page 746, "Still less should it be so when the victim dies as Chance died, pursuant to a carefully executed plan." Certainly as serious as kidnaping for purposes of robbery with bodily harm is the murder with malice aforethought of a police officer intentionally killed in the performance of his official duties and in retaliation therefor.

Third, the punishment of life imprisonment without possibility of parole is not as awesome or as comprehensive as pointed out by appellant. He is not without recourse and the penalty is not tantamount to spending the rest of his life behind bars. Available is the Governor's power of

commutation (art. V, § 8, Cal. Const.), procedures for commutation of a prisoner sentenced to life imprisonment without possibility of parole (§§ 4800-4814, Pen. Code) and the liberal policies therefor set out in title 15, California Administrative Code. (See *People v. Matthews* (1979) 98 Cal.App.3d 453, 458-459 [161 Cal.Rptr. 101].)

■ The California Supreme Court in *In re Lynch* (1972) 8 Cal.3d 410 [105 Cal.Rptr. 217, 503 P.2d 921] articulated three tests for determining whether a punishment is so disproportionate to the offense committed that it shocks the conscience and offends fundamental notions of human dignity. The first test or technique involves examination of the nature of the offense with particular regard to the degree of danger to present society (p. 425). The second is a comparison of the challenged penalty with the punishment prescribed in the same jurisdiction for different offenses which, by the same test must be deemed more serious. (P. 426.) Closely related is the third, a comparison of the challenged penalty with punishments prescribed for the same offense in other jurisdictions having identical or similar constitutional provision, "and if the challenged penalty is found to exceed the punishments decreed for the offense in a significant number of those jurisdictions, the disparity is a further measure of its excessiveness." (P. 427.)

"Underlying the three criteria of disproportionate punishment prescribed by *Lynch* is a central idea: the social utility of the particular penalty.... Presented with a rational basis for the choice, the courts should hesitate to call the penalty cruel or unusual." (*In re Maston* (1973) 33 Cal.App.3d 559, 562 [109 Cal.Rptr. 164] [kidnaping for purpose of robbery with bodily harm].) *Maston* discussed the legislative history of the augmented penalty for aggravated kidnaping in considering the constitutional challenge that life imprisonment without possibility of parole constituted cruel and unusual punishment and concluded as to the first *Lynch* technique that "The arguments for and against the social utility of the augmented penalty are settled by the Legislature's choice. Section 209 evinces a legislative hope that the augmented penalty may in some cases prevent physical harm. Even though it meets with as much failure as success, the hope is rational." (P. 563.)

But we are not dealing here with kidnaping for purpose of robbery with bodily harm as in *In re Maston, supra,* 33 Cal.App.3d 559 and *People v. Isitt, supra,* 55 Cal.App.3d 23, or even with kidnaping where the victim dies as in *People v. McKinney* (1979) 95 Cal.App.3d 712 [157 Cal.Rptr. 414], but with a far more serious crime of murder with

malice aforethought of a deputy sheriff intentionally killed while acting in the performance of his official duties and in retaliation therefor. By its very nature the crime involves violence and is committed with deliberation and malice and the intent to kill. More and more law enforcement officers, while performing their official duties are being intentionally killed to frustrate an arrest or permit an escape or in retaliation for the performance of their police duties. Here the deputies were ambushed and could not even defend themselves. When defendant saw the deputies detain a friend and pick up the bottles of PCP he and his friend had dropped, he went to his apartment, got a .22 rifle, positioned himself and in the cover of night deliberately fired shot after shot at the deputies with the intention of killing both. Such lawlessness the people in approving Proposition 7 sought to deter by expanding the special circumstances relating to the murder of a peace officer while in the performance of his duties, and by increasing the severity of the penalty. "[T]he resulting legislative [or electoral] judgment commands the respect of the courts unless its unconstitutionality '"clearly, positively, and unmistakably appears."' (*People* v. *Wingo, supra,* 14 Cal.3d [169] at p. 174 [121 Cal.Rptr. 97, 534 P.2d 1001].)" (*People* v. *Isitt, supra,* 55 Cal.App.3d 23, 30.) As in *In re Maston, supra,* 33 Cal.App.3d 559, 565, we do not deem the penalty of life imprisonment without possibility of parole to be disproportionate by either the first *Lynch* technique or by the standards of internal comparison because it serves a rationally conceived penal purpose.

Nor is it disproportionate by standards of interstate comparisons. A table of maximum penalties currently available for "Capital Murder" in the 50 states and the District of Columbia prepared by the California District Attorneys Association for a case now pending before the Cali-fornia Supreme Court (*People* v. *Zimmerman,* Oct. 20, 1981 (Crim. No. 218581))[3] and appended to respondent's brief herein, demonstrates that the penalty of life imprisonment without possibility of parole is widespread as a penalty for "Capital Murder" in the United States. This puts to rest any claim of "gross excessiveness in relation to the rest of the nation." (*In re Maston, supra,* 33 Cal.App.3d 559, 566.) Considering the social utility of the challenged punishment in light of the evil to which that punishment is directed, we cannot say that the penalty of

---

[3]Also pending before the California Supreme Court are similar cases of *People* v. *Grundy* March 18, 1981 (Crim. No. 21909); *People* v. *Williams,** December 30, 1980 (Crim. No. 21783); *People* v. *Kelly,* August 6, 1981 (Crim. No. 22137).

*Reporter's Note: For Supreme Court opinion see 30 Cal.3d 470 [179 Cal.Rptr. 443, 637 P.2d 1029].

life imprisonment is "clearly, positively [or], unmistakably" disproportionate to the offense of first degree murder of a peace officer intentionally killed while in the performance of his official duties and in retaliation for the performance of those duties.

As to federal standards, the United States Supreme Court is reluctant to review legislatively mandated terms of imprisonment, no matter how long, and "Outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare." (*Rummel* v. *Estelle* (1980) 445 U.S. 263, 272, 273-274 [63 L.Ed.2d 382, 389-391, 100 S.Ct. 1133].) Moreover, the court has recognized "that, in noncapital cases, the established practice of individualized sentences rests not on constitutional commands, but on public policy enacted into statutes." (*Lockett* v. *Ohio* (1978) 438 U.S. 586, 604-605 [57 L.Ed.2d 973, 989-990, 98 S.Ct. 2954].)

The judgment is affirmed.

Hanson (Thaxton), J., and Dalsimer, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 17, 1982.