Filed 5/19/26  P. v. Schlapia CA3

<u>NOT TO BE PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

| | |
|---|---|
| THE PEOPLE,<br>    Plaintiff and Respondent,<br><br>    v.<br><br>STEVEN RONALD SCHLAPIA,<br>    Defendant and Appellant. | C102466<br><br>(Super. Ct. No. 22F313) |

Following a dispute over a motorcycle, defendant Steven Ronald Schlapia shot the victim, beat and taunted him while he was disabled on the ground, and then shot him in the head, killing him.  Schlapia then set the victim's body on fire.  The defense theory at trial was that Schlapia acted in self-defense.  A jury found Schlapia guilty of first degree murder, torture, mayhem, assault with a semiautomatic firearm, arson, possessing a firearm as a convicted felon, and possessing ammunition as a convicted felon.

On appeal, Schlapia raises numerous challenges to his convictions and sentence. He argues that the trial court incorrectly admitted a variety of impeachment evidence, improperly excluded expert testimony on the victim's behavior, erroneously failed to instruct the jury on unanimity as to the murder count, and found true a prior strike conviction without sufficient evidence.  He additionally claims that the court made improper dual use of facts, should have stayed the sentences for the assault and possession of ammunition counts under Penal Code section 654, abused its discretion in

1

declining to strike his prior strike conviction, and made several sentencing errors in the abstract of judgment and sentencing minute orders. We agree that the sentencing errors should be corrected but find no merit in Schlapia's other claims.

BACKGROUND

The People charged Schlapia with murder (Pen. Code, § 187, subd. (a); count 1); torture (§ 206; count 2); mayhem (§ 203; count 3); assault with a semiautomatic firearm (§ 245, subd. (b); count 4); arson (§ 451, subd. (d); count 5); possession of a firearm as a felon (§ 29800, subd. (a); count 6); and possession of ammunition as a felon (§ 30305, subd. (a)(1); count 7).[1] The People also alleged that Schlapia had been convicted of assault with a deadly weapon in 1998, a prior serious felony under section 1170.12. As to the murder count, the People alleged mayhem and torture special circumstances under section 190.2, subdivision (a)(17) and (18) and an enhancement for firearm use with great bodily injury or death under section 12022.53, subdivision (d). The People alleged the same firearm enhancement as to the torture and mayhem counts. As to the assault count, the People alleged a firearm use enhancement under section 12022.5, subdivision (a) and great bodily injury enhancements under section 12022.7, subdivisions (a) and (b).

At trial, the jury heard testimony that Schlapia had known the victim less than a year. The two met when the victim helped Schlapia after his car had broken down. Schlapia visited the victim and his family several times. The victim kept a motorcycle at home that he was in the process of repairing.

The day before the murder, Schlapia went to the victim's house. Later that night, the victim's wife heard the front door open and close twice within a short period of time and the sound of the victim's motorcycle. The next morning, Schlapia's car was in the driveway, and the motorcycle was gone.

---

[1] Undesignated statutory references are to the Penal Code.

The victim and his wife texted and called Schlapia several times over the course of the day to get the motorcycle back without success. The victim decided to retrieve the motorcycle himself. The victim tried to arrange a ride with someone by text, saying, "If u called thats me I would give u a heater." The other person replied, "When are you ready. I'll drive you there and get your bike back. I have my own heat." The victim ultimately got someone else, Curtis Lupo, to give him a ride to Schlapia's house. Neither Lupo nor the victim's wife saw the victim carrying a firearm.

Lupo dropped the victim off at Schlapia's house and began to turn his truck around. He heard gunshots and saw Schlapia holding a gun and chasing the victim. Schlapia threatened Lupo, saying, "I don't give a shit who you are. I'll blow you away too." Lupo pulled away, and Schlapia returned to the victim, saying, "I told you not to come here." Lupo's view of Schlapia and the victim was partially obscured by a vehicle, but he saw Schlapia swing something downward and heard the victim yell. Lupo told Schlapia he wanted to leave with the victim, and Schlapia yelled at the victim to "get out and crawl." The victim said he could not because his leg had been shot. Lupo could see Schlapia swinging something at the victim. Lupo fled and called 911.

One of Schlapia's neighbors heard the initial gunshots and heard someone saying, "You don't have to shoot me. I got a wife and kids." Another voice said, "[F]uck you. I'm going to kill you and your family," followed by a gunshot. After the gunshot, the neighbor did not hear the first man's voice again.

Another witness heard the initial gunshots and hid behind a nearby tree to record what was happening. The recording was entered into evidence and played for the jury. The recording was obscured and did not show the interactions between Schlapia and the victim, but it captured audio of them, and the events were narrated by the witness. Among other things, the recording captured the victim screaming and moaning in pain, Schlapia taunting the victim and saying that he would kill him and his family, and the victim saying he could not feel his legs. At one point, the victim yelled at Schlapia to

3

"[g]et off my back," before another gunshot. The witness narrated, "He just shot him again. And then I heard a metal bang. And now, I don't hear anything." In a 911 call, the witness reported that Schlapia had set a motorcycle on fire in his driveway.

When law enforcement arrived, they found the victim's body under a door that was spray painted with the words "fuck you asshole." The victim had a gunshot wound to the head, and his body was burned, as if someone had poured gasoline on it after death. The coroner found bullet holes in the victim's lower back, the back of his head, his shoulder, and his ribs as well as extensive swelling on his face. The bullets all entered the victim from behind. The gunshot wound to the head occurred when the victim was lying prone on the ground. The gunshot to the head was the cause of death. The gunshot in the lower back likely paralyzed the victim. The facial swelling indicated blunt force trauma before death, likely caused by being struck with an object, although some of it could have been caused by fists.

Law enforcement found spent .380 cartridge cases around the crime scene and a semiautomatic .380 pistol in Schlapia's garage. They also found a box of .380 cartridges. In the kitchen, they found a bag of .22 caliber ammunition and a single shotgun shell. An analysis determined that the bullets found in the victim's body were fired from the semiautomatic pistol.

The People also introduced evidence of a recorded call that Schlapia made from jail. In the call, Schlapia said, "I shot that dude in the chest four times. Big fucking deal. I shot him in the chest and then I shot him two more times. It doesn't fucking matter … I shot that motherfucker. Fuck yeah. It was pitch black. He pulled a gun on me. I shot that motherfucker. I whacked him four times with a gun. Boom – boom – boom. Went and reloaded again. Hey, come back out. He started running. He wasn't – I don't know what it was. All I know is, uh, you know what? I shot the motherfucker again. I don't care. I'm getting away with it. It is what it is." He ended by saying, "Okay. Get me out of here. Just lie – whatever you gotta do. Whatever it takes."

4

The defense theory was that Schlapia acted in self-defense. Schlapia called as a witness Amanda D'Orazio, a toxicologist, who testified about the presence of methamphetamine and amphetamine in the victim's blood. D'Orazio's testimony is recounted in more detail where relevant below.

Schlapia also testified. Among other things, he said that he had seen the victim using methamphetamine before. He took the victim's motorcycle because his car had broken down and he did not think it would be a problem to borrow it; he planned to return it on a tow truck because it had a flat tire. When the victim came to his house, Schlapia did not recognize him, but the victim pointed a gun at him. Schlapia was scared for his life, so he shot at the person four times. The person did not react or fall, so Schlapia went back into his garage to reload. Schlapia then recognized the victim's voice. The victim was on the ground, but Schlapia never went near or hit him. Schlapia was walking around looking for his telephone to call 911 when the victim tried to grab or lunge at him, so Schlapia shot him. Schlapia acknowledged that about 13 minutes passed between the first four shots and the last shot.

Schlapia tried to set the motorcycle on fire afterwards and may have splashed some gasoline on the victim's body, after which the body caught fire. He put the door on the body to protect it from the elements. He vaguely recalled giving an interview to law enforcement but had been up for about 48 hours and "was kind of delirious."

The People introduced video of Schlapia's interview with police in rebuttal. The relevant portions of that interview are discussed in more detail below.

The jury found Schlapia guilty of all counts and found true the special circumstance and enhancement allegations. The trial court found the prior strike allegation true and sentenced Schlapia to a total sentence of 27 years consecutive to life without parole plus 25 years to life.

Schlapia filed a timely notice of appeal.

5

DISCUSSION

I.

Schlapia challenges the admission of three different kinds of impeachment evidence: evidence of his prior convictions for crimes of moral turpitude, evidence of a pending arrest, and statements about a possible polygraph test. We conclude that none of these claims demonstrates prejudicial error.

A.

Schlapia first contends that the trial court erred in permitting the prosecution to impeach him with two attempted vehicle theft convictions from 2005 and 2006, arguing that they were too dated to be relevant. We find no abuse of discretion in the trial court's decision to admit evidence of the convictions.

1.

Before trial, the prosecution filed a motion in limine arguing that, if Schlapia decided to testify, it should be permitted to impeach his credibility with his prior convictions for crimes of moral turpitude occurring between 1991 and 2006, including convictions in 2005 and 2006 for attempted vehicle theft. Schlapia opposed the introduction of these convictions, arguing that they were too remote in time. The trial court tentatively denied the prosecution's motion with respect to a number of the prior convictions, but tentatively granted it with respect to the 2005 and 2006 convictions, explaining that the convictions "are aged, but less so than the earlier crimes and they are unlike any allegation in this case." The court stated that it "intend[ed] to sanitize the conviction by allowing the People to ask Mr. Schlapia if he has been convicted of crimes of moral turpitude. If he answers yes, the inquiry is complete, which allows the People to argue the convictions negatively reflect on his credibility. If he answers no, the People may put on evidence of the convictions to establish their existence." After further discussion of the issue on the record, the court sent the parties an email that is not a part of the record.

6

During Schlapia's cross-examination, he admitted that he had been convicted of crimes of moral turpitude in 2005 or 2006. The trial court instructed the jury using CALCRIM No. 303, stating in part, "You may consider whether a person has been convicted of a crime of moral turpitude in assessing his or her credibility … [¶] You may not conclude that a person convicted of a crime of moral turpitude, or a felony, is predisposed to commit crime." The court also read CALCRIM No. 316, saying, "If you find that a witness has been convicted of a crime of moral turpitude, you may consider that fact only in evaluating the credibility of the witness's testimony. The fact of a conviction does not necessarily destroy or impair a witness's credibility. It is up to you to decide the weight of that fact and whether that fact makes the witness less believable."

2.

"Any prior felony conviction of any person in any criminal proceeding … shall subsequently be used without limitation for purposes of impeachment … in any criminal proceeding." (Cal. Const., art. I, § 28, subd. (f)(4); see Evid. Code, § 788.) The trial court retains discretion under Evidence Code section 352 to disallow impeachment by prior conviction when the probative value of the prior conviction is substantially outweighed by its prejudicial effect. (*People v. Clair* (1992) 2 Cal.4th 629, 654; *People v. Mendoza* (2000) 78 Cal.App.4th 918, 925.) In exercising its discretion, the court must consider whether the prior conviction reflects adversely on the witness's honesty or veracity, the conviction's nearness or remoteness in time, its similarity to the present offense, and the potential effect on the defendant's decision to testify. (*Mendoza*, at p. 925.) A trial court's decision to admit or exclude evidence under section 352 is reviewed for abuse of discretion. (*People v. Ramos* (1997) 15 Cal.4th 1133, 1170.)

Attempted vehicle theft is a crime of moral turpitude. (*People v. Rodriguez* (1986) 177 Cal.App.3d 174, 178.) As such, Schlapia's convictions for that offense reflect adversely on his honesty. Attempted vehicle theft is also dissimilar from the current offenses, reducing any risk of undue prejudice. (*People v. Pugh* (1983) 145 Cal.App.3d

7

854, 857.) Moreover, the convictions were sanitized, and Schlapia only admitted that he was convicted of crimes of moral turpitude. Schlapia did, in fact, testify, eliminating the fourth factor from consideration.

Schlapia's primary argument is that the convictions were too remote in time from his 2024 trial to be admissible. Relying on *People v. Carpenter* (1999) 21 Cal.4th 1016 and *People v. Turner* (1994) 8 Cal.4th 137, abrogated on other grounds by *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5, he argues that his prior convictions should have been excluded because, unlike the defendants in *Carpenter* and *Turner*, he was not continuously incarcerated or otherwise incapacitated in the period between his attempted auto theft convictions and his testimony because he sustained only probation revocations in that time. This argument is not persuasive, because neither case *requires* a defendant to be continuously incarcerated or incapacitated during an intervening period for an otherwise-remote conviction to be relevant. (*Carpenter*, at p. 1056; *Turner*, at p. 200.) Nor is there a rule rendering remote convictions automatically inadmissible for impeachment purposes. (*People v. Mendoza*, *supra*, 78 Cal.App.4th at pp. 925-926.) Thus, two of the four factors weighed in favor of admitting the convictions, one was irrelevant, and the fourth, remoteness, weighed against, but did not forbid, admission of the convictions. The trial court's analysis explicitly recognized these factors and weighed them accordingly. We find no abuse in the court's exercise of its discretion.

B.

Schlapia further objects to the introduction of a portion of his police interview in which he mentions a pending arrest. We conclude there was no prejudicial error.

1.

In a motion in limine, the prosecution included a request to impeach Schlapia with a then-pending case involving carrying a loaded firearm. The trial court tentatively denied the motion, reasoning that the admission of the evidence could impact Schlapia's

decision to testify because of the legal exposure he could face testifying about a pending charge.

During direct examination, Schlapia testified that he had a firearm at the time of the crime "[f]or protection. I live – I'm a single male, vulnerable, living out in rural Shasta County. Call the police, you never know what's – something like this could happen." On cross-examination, he denied that he usually carried a gun.

In rebuttal, the People played a portion of Schlapia's interview with police. In the excerpt, Schlapia made several references to the arrest in the pending case, saying, "They found a loaded pistol in my car. And they found a loaded rifle. That's cool. He went right to them. Right to them. Okay. I knew I had it in my pocket. So what? It's a misdemeanor." In another portion of the interview, Schlapia said, "I get arrested with, uh, some on me, and they find a gun in my car, and then they get exonerated and – and I'm on probation. But, all of a sudden it's two years almost there, and now they want to give me to trial. I'm on probation already."

After the interview was played, defense counsel objected, noting that the trial court had previously ruled that the arrest would be excluded. The People argued that Schlapia had opened the door to the evidence because he testified that he did not carry guns. The court agreed that the evidence could be used for impeachment but not as character evidence. Defense counsel asked for a mistrial.

The trial court denied the motion for mistrial but said that it would modify the instruction limiting the permissible uses of the evidence to make clear that it could only be used for its impeachment value. The court instructed the jury using a modified version of CALCRIM No. 356, saying, "You have heard evidence that the Defendant made statements to a peace officer. I'm referring to the statements made by Mr. Schlapia during an interview with [two law enforcement officers] occurring on March 17, 2022. That's People's Exhibit 277 that was admitted in evidence today. And the testimony of [one of the officers] regarding his recollection of Mr. Schlapia's statements made during

9

that same interview. [¶] Do not consider this evidence for any other purpose except for the limited purpose of deciding whether you believe Mr. Schlapia's testimony in trial. You may not consider it as proof that the statement is true or for any other purpose. Do not conclude from the evidence that Mr. Schlapia had a bad character or that he is disposed to commit crime."

## 2.

Schlapia does not explain the legal basis for his assertion that this ruling was in error; nor does he cite any legal authority in support of his claim. He also does not explain why this evidence was prejudicial. Arguments without authority are forfeited on appeal. (*Shaw v. Los Angeles Unified School Dist.* (2023) 95 Cal.App.5th 740, 754.)

Even were we to consider the claim, we see no reasonable probability that the result would have been more favorable without the evidence. The admitted statements were brief and ambiguous, and the trial court admonished the jury not to consider the statements as evidence of Schlapia's bad character, limiting any damage the statements would have had. (*People v. Kocontes* (2022) 86 Cal.App.5th 787, 859-860 [curative admonition "sufficient to cure any prejudice from … unsolicited and isolated remarks" about prior incarceration].) Moreover, there was substantial other evidence impeaching his credibility, including evidence that he had lied to law enforcement about his name, his statements that he did not know if anyone had come to his house the night of the murder, and his claim that he had "no idea" who killed the victim. There was also overwhelming evidence of Schlapia's guilt, including the contemporaneous recording of the murder, which contradicted Schlapia's account of events. Any error in allowing the jury to hear Schlapia's statements about the pending charge was harmless.

## C.

Schlapia also objects to the admission of another excerpt of the same police interview, in which a detective asked Schlapia, "would you be willing to take, like, a lie detector test?" Schlapia said, "I don't care," and "what do you want it to tell you? What

do you want it to tell you, what are you saying here?" when asked what he thought such a test would say. The detective repeated the question, asking, "If you took a lie detector test, what do you think it would tell us?" Schlapia replied, "I have no idea. I've never taken one. Okay? Th - that's messed up. I did steroids, okay I – I screwed up and … ."

Schlapia contends that the admission of these statements ran afoul of Evidence Code section 351.1, subdivision (a), which forbids "any reference to an offer to take, failure to take, or taking of a polygraph examination," although defense counsel did not object to the evidence when it was introduced. Even were we to consider the issue, any error was harmless.

"Evidence Code section 351.1 prohibits the admission of polygraph evidence in criminal cases absent a stipulation. [Citations.] This section 'codifies a rule that [the California Supreme Court] adopted more than 30 years ago … in which [the court] said that polygraph test results "do not scientifically prove the truth or falsity of the answers given during such tests." ' [Citation.] The statutory ban against admission of polygraph evidence ' "is a 'rational and proportional means of advancing the legitimate interest in barring unreliable evidence.' " ' " (*People v. McKinnon* (2011) 52 Cal.4th 610, 662-663.) To evaluate prejudice resulting from the admission of such evidence, we consider whether "it is reasonably probable that but for [the error] a result more favorable to the defendant would have been reached." (*People v. Basuta* (2001) 94 Cal.App.4th 370, 391.)

There is no indication this evidence had any effect on the jury's assessment of Schlapia's credibility. First, his statement was that he did not have any idea what a polygraph examination would show because he had never taken such an examination and did not care if he had to take one. This does not suggest a lack of credibility; indeed, the fact that Schlapia was not afraid to take a polygraph examination could be construed as confidence that he would be vindicated, thereby enhancing the credibility of his statements. (See *People v. Basuta*, *supra*, 94 Cal.App.4th at p. 390 [juror might conclude

11

that witness's "apparent readiness to take a polygraph examination reflected her confidence in its result"].) Second, there was significant other evidence impeaching Schlapia's credibility, and it is unlikely that references to a proposed lie detector test made any difference. (See *People v. McKinnon*, *supra*, 52 Cal.4th at pp. 665-666.) For the same reason, we reject Schlapia's claim that his attorney's failure to object to the evidence amounted to the ineffective assistance of counsel. (*In re Crew* (2011) 52 Cal.4th 126, 150 ["If a claim of ineffective assistance of counsel can be determined on the ground of lack of prejudice, a court need not decide whether counsel's performance was deficient"].)

## II.

Schlapia next contends that the trial court erred when it precluded him from introducing evidence about the effects of methamphetamine on the victim's behavior before his death. He asserts that such evidence would have supported his self-defense theory. He also argues that he received ineffective assistance of counsel because defense counsel failed to seek additional testimony from a psychologist or psychiatrist on the subject.

## A.

Before opening statements, the parties discussed the possibility of Dr. James Olson, the forensic pathologist who performed the autopsy in this case, testifying about the presence of methamphetamine in the victim's body based on a blood toxicology report. The trial court determined that a hearing under Evidence Code section 402 was required to evaluate the doctor's testimony.

In the 402 hearing, Dr. Olson testified that he did not have any information about the process involved in testing blood or urine samples collected by the coroner's office. He explained that he could not "predict with any precision how a person's going to respond" based on the level of methamphetamine in his or her blood because "people

respond differently to drugs." He acknowledged that methamphetamine "could provoke violent behavior," but reiterated that "individuals respond differently."

Schlapia's counsel explained that the defense intended to use Dr. Olson's testimony about the victim's methamphetamine use in conjunction with the evidence of the victim's threatening behavior toward Schlapia to show that the victim was acting aggressively the night of his murder.

The trial court found that Dr. Olson's lack of knowledge about the analysis done for the toxicology report presented a foundational problem, in that the fact that the victim had a high level of methamphetamine in his blood at the time of death was a case-specific fact under *People v. Sanchez* (2016) 63 Cal.4th 665, and that the report therefore had to be excluded. The defense thus proposed calling Amanda D'Orazio, a toxicologist, who could testify about the toxicology report and "what behaviors [methamphetamine] might be expected to produce."

The trial court held a 402 hearing for D'Orazio. D'Orazio testified that she was the toxicologist who oversaw the preparation of the victim's toxicology report. She explained the effects of methamphetamine in the human body, saying that it broke down into amphetamine, which could cause "increased alertness, decreased appetite, a feeling of well-being, euphoria, [and] excitement," and increased heart rate and blood pressure. When methamphetamine wore off, it could produce lethargy, drowsiness, and irritability. The victim had higher than therapeutic levels of methamphetamine and amphetamine in his blood. She testified that she was "qualified to discuss drugs and general effects," but was not qualified "to speak to a specific person's level of impairment or a specific case as it relates to certain concentrations." She said that drug concentration levels in the blood may be elevated after death because decomposition or trauma may redistribute drugs from other tissues to the blood. She could not opine on how a person would have behaved based on a toxicology report because doing so would be inappropriate under the standards of the American Academy of Forensic Sciences.

13

Citing *People v. Wright* (1985) 39 Cal.3d 576, the trial court found that the toxicology evidence was admissible and that D'Orazio could "testify about the general impacts of amphetamine and methamphetamine in the system," such as "impulsivity and irritability." She could not, however, testify as to the "specific impacts on [the victim]."

When D'Orazio testified before the jury, she stated that the victim's blood contained methamphetamine and amphetamine above therapeutic levels and that this could have effects such as decreased appetite, increased heart rate, elevated blood pressure, increased alertness, euphoria, and excitement. When someone is coming off methamphetamine, they may be lethargic or irritable. She did not testify about the specific effects methamphetamine may have had on the victim's behavior.

B.

Even assuming that the trial court erred in excluding further testimony by Dr. Olson and D'Orazio and that the claim was not forfeited on appeal as the People maintain, any such error was harmless under any standard. (*Chapman v. California* (1967) 386 U.S. 18, 24 ["harmless beyond a reasonable doubt" standard for federal constitutional errors]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [reasonable probability standard for state-law errors].) Both Dr. Olson and D'Orazio testified at their respective 402 hearings that they could not say how a person would have behaved under the influence of methamphetamine at any given time, either because drugs affect people differently or because it would be professionally inappropriate to opine on such a hypothetical. Thus, even had Schlapia been permitted to inquire into the topic at trial, he would not have obtained testimony that supported his theory that the victim was acting violently or aggressively on the night of the murder because of his drug use.

We likewise reject Schlapia's assertion that defense counsel was ineffective because he did not seek the expert opinion of a psychologist or psychiatrist. This argument assumes that an expert would have testified consistently with the defense theory, and inconsistently with the two other experts who testified, and "a claim of

14

ineffective counsel cannot be established by mere speculation regarding the 'likely' testimony of potentially available witnesses." (*People v. Medina* (1995) 11 Cal.4th 694, 773 ["We cannot assume from a silent record that particular witnesses were ready, willing and able to give mitigating testimony, nor can we speculate concerning the probable content or substance of such testimony"].)  Nothing in the record therefore would permit us to conclude that Schlapia's attorney rendered constitutionally inadequate assistance in failing to pursue additional expert testimony.

III.

Schlapia additionally argues that the jury should have been instructed on the concept of unanimity as to the murder count because the jury could have interpreted that count to rest on two distinct events:  (1) the first shots Schlapia fired at the victim, or (2) the final shot Schlapia fired at the victim.  In Schlapia's view, a unanimity instruction was required because different theories of self-defense applied to each set of actions, with perfect self-defense applicable to the first three shots and imperfect self-defense applicable to the final shot.  We disagree that the instruction was necessary.

A.

After the People rested, the trial court and the parties discussed a unanimity instruction.  As to the murder count, defense counsel argued, "depending on how the People organize their theory or theories of murder," there could be "two distinct events, one group of shooting that happens initially, [and] another shot that happens later."  The parties agreed to review the pattern instructions and revisit the issue.

During the defense case, the trial court checked with the parties to see if a unanimity instruction was still required for the murder count.  Defense counsel replied, "So long as the People are specific as to what act constitutes the murder, I don't think so, but they need to be specific."  The court agreed, and in response to the court's questions, the People confirmed that they were arguing that only the final shot was at issue in the murder count.  Defense counsel accepted the People's response.  The court instructed the

15

jury on unanimity using CALCRIM No. 3501 as to the other counts, but not the murder charge.

In closing arguments, the prosecution described the shooting, saying that witnesses "heard the initial shots" and then heard the victim begging and moaning. The prosecutor described the ensuing events, arguing that the victim was "on the ground for 15 minutes, and [Schlapia's] over him. [']I'm going to fucking kill you.['] The victim] can't move. [The victim] can't walk. [The victim] can't use his arms. He's laying in the dirt. Fifteen minutes." She described Schlapia beating the victim during the fifteen minutes. Then she concluded by referring to the neighbor's testimony: "[T]his is what he hears. He hears [the victim] say, Please don't kill me. I have a wife and kids. [¶] Then he hears [Schlapia] say, Fuck you. I'm going to kill your family. And there's a gunshot through the back of the head. It doesn't get more premeditated than that, does it?"

Discussing the various theories of murder, the prosecutor again referred to Schlapia's statements during the minutes between the initial and final shots as evidence of premeditation, saying, "When – when you hear him say, don't kill me, and he says I'm going to fucking kill you, and then he shoots you, and he tells you for 15 minutes he's going to kill you, that's premeditation and motivation. It's not a plan. It's not a written out set of rules that I'm going to do. It's that he thought about it, and he chose to do it. [¶] And without question, that happened here. Without question. He walked around, he mocked him, and he told him he was going to kill him. Motherfucker, you're dead. Motherfucker, I'm going to kill you, and he killed him. That's first-degree murder."

Defense counsel agreed that the final shot was at issue in the murder count, but argued it was done in self-defense, saying: "Similarly, the gunshot that kills [the victim] is to the head. This is calculated to kill [the victim] in fear of one's own self being killed or injured. This is not a shot taken with an intention to cause pain, extreme, or of a long duration. This is calculated to kill. It cannot be torture."

16

B.

"In a criminal case, a jury verdict must be unanimous." (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) "Additionally, the jury must agree unanimously the defendant is guilty of a *specific* crime. [Citation.] Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act." (*Ibid.*) "This requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' " (*Ibid.*) The prosecution may elect among the crimes by " ' "tying each specific count to specific criminal acts elicited from the victims' testimony"—typically in opening statement and/or closing argument. [Citations.] … [Citation.] [¶] Under these principles, there is an implicit presumption that the jury will rely on the prosecution's election and, indeed, is bound by it.' " (*People v. Brugman* (2021) 62 Cal.App.5th 608, 627.)

The prosecution in this case clearly communicated its election to the trial court, defense counsel, and the jury. During trial, the prosecution agreed with the court that only the final shot constituted the murder count, and defense counsel agreed that no unanimity instruction was required as a result. More importantly, the prosecution explained the murder count to the jury in closing arguments by describing the final shot that killed the victim as "first-degree murder." It also argued that premeditation for the murder count was shown by Schlapia's conduct during the period between the initial and final shots. This argument would not make sense if the prosecution intended for the initial shots to form the basis for the murder charge because the cited evidence of premeditation all occurred after, not before, the initial shots. Notably, defense counsel accepted that framing and did not object, after setting forth a clear expectation that he believed the prosecution would need to "be specific" about which conduct constituted the murder. The prosecution's argument effectively conveyed an election to the act forming

17

the basis for the murder charge, and no instruction on unanimity as to that count was therefore required. (*People v. Brugman*, *supra*, 62 Cal.App.5th at p. 627.)

IV.

Schlapia asserts that there was insufficient evidence to support the finding that he suffered a prior strike conviction. In his view, the record does not establish that he was previously convicted of assault with a deadly weapon, a strike offense, rather than assault by force likely to cause great bodily injury, a non-strike offense. We disagree.

A.

As noted above, the People alleged that Schlapia had a 1998 conviction for assault with a deadly weapon that qualified as a strike. After the jury delivered its verdict, the trial court held a bench trial on the prior strike allegations. The People presented certified documents substantiating Schlapia's prior conviction. The information for that conviction alleged that Schlapia had committed "assault … with a deadly weapon, to wit: Bottle, and by means of force likely to produce great bodily injury." On the change-of-plea form for the conviction, Schlapia agreed that he was pleading guilty to "Ct 1 (245(a)(1)), a serious felony pursuant to PC 1192.7," and initialed next to a handwritten paragraph saying, "I understand my present conviction can affect future convictions as follows: A new felony committed in [the] future would be double the base term of the new felony." A minute order states that "defendant is guilty of an offense of assault great bodily injury and with a deadly weapon, a felony … as charged in Count 1 of the Information on file herein." (Some capitalization omitted.) The abstract of judgment for the case states that Schlapia was convicted of "Asslt GBI Dead/Wpn" under section 245, subdivision (a)(1). (Some capitalization omitted.)

After presenting these exhibits, the People argued that Schlapia had stipulated to the factual basis contained in a police report, which said that he had committed assault with a bottle, and acknowledged on the plea form that the conviction was a strike conviction. Defense counsel argued that there was no specific admission in the People's

18

certified records that Schlapia had used a deadly weapon, and the version of section 245, subdivision (a)(1) in effect at the time of the conviction encompassed assaults that were not strike offenses. The trial court stated that it was reviewing the probation report, which mentioned "a factual basis for the present offense to be hit in the head with a bottle by the Defendant." It promised to issue a ruling on the issue. The reporter's transcript of the 1998 plea colloquy, the police report, and the probation report for the 1998 conviction are not in the record before us.

The record before us also does not contain a trial court order finding the prior strike allegation true, but the court ultimately sentenced Schlapia consistent with a finding that the 1998 conviction was true and qualified as a strike.

B.

Under the Three Strikes law, a defendant's sentence may be enhanced upon proof that he or she was previously convicted of a strike, i.e., a " 'violent felony' " under section 667.5, subdivision (c) or a " 'serious felony' " under section 1192.7, subdivision (c). (§§ 667, subds. (c)-(f), 1170.12, subds. (a)-(d).) "Under section 1192.7, subdivision (c)(31), assault with a deadly weapon qualifies as a serious felony and is, in turn, a strike under section 667, subdivisions (d)(1) and (e)(1). [Citation.] Assault with force likely to cause great bodily injury is not a serious felony, and, in turn, is not a strike." (*People v. Hudson* (2018) 28 Cal.App.5th 196, 203.) When Schlapia pleaded guilty in 1998, former section 245, subdivision (a)(1) forbade "assault upon the person of another with a deadly weapon or instrument other than a firearm or by any means of force likely to produce great bodily injury." Whether Schlapia's 1998 conviction counts as a strike thus turns on whether his conviction under former section 245, subdivision (a)(1) was for assault with a deadly weapon or assault with force likely to cause great bodily injury.

Under section 969f, subdivision (a), which was in effect at the time Schlapia entered his guilty plea, "[i]f the defendant pleads guilty of the offense charged, the

19

question whether or not the defendant committed a serious felony as alleged shall be separately admitted or denied by the defendant." Section 969f "was enacted in order to prequalify a crime as a serious felony in the event of a defendant's future conviction of another serious felony. [Citation.]" (*People v. Leslie* (1996) 47 Cal.App.4th 198, 204.) The law was adopted so the prosecution did not have to prove a previous conviction for a second time " 'when it is alleged that a defendant has a prior serious felony conviction.' [Citation.] Further, section 969f 'would allow the fact that a crime is a serious felony to be proven at the time the first crime is tried so that it may become a matter of record.' " (*Leslie*, at p. 204.)

"When a defendant challenges the sufficiency of the evidence to uphold a finding that his prior convictions qualified as strikes, the test on appeal is whether a reasonable trier of fact could have found that the prosecution sustained its burden. We review the record in the light most favorable to the trial court's findings." (*People v. Towers* (2007) 150 Cal.App.4th 1273, 1277.)

Here, there is sufficient evidence to support a finding that the assault conviction was a strike offense because Schlapia admitted that the conviction was a serious felony under section 1192.7 after being advised in writing of the consequences. The 1998 plea agreement's failure to explain the underlying conduct that made the offense a strike does not undermine this conclusion because the plea agreement is consistent with the express purpose of section 969f, which is to make a prior strike conviction a matter of record, so that it need not be proven again. (See *People v. Leslie, supra*, 47 Cal.App.4th at p. 204; *People v. Delgado* (2008) 43 Cal.4th 1059, 1072 [admission that prior conviction is a serious felony "become[s] an explicit part of the record of conviction, leaving no room for confusion if and when the issue becomes relevant to the sentence for a subsequent felony"].) Moreover, Schlapia agreed that the conviction would operate as a strike in the 1998 change-of-plea form when he indicated he understood that future felonies would be sentenced at double the base term. We thus disagree with Schlapia's contention that the

prosecution here was required to prove "the exact degree of force" used in the prior offense.

Relying on *People v. Bueno* (2006) 143 Cal.App.4th 1503, Schlapia maintains that the plea form was insufficient to show a prior strike conviction under section 969f. But in *Bueno*, unlike here, the plea form contained "no admission that the offense was a serious felony"; nor did it "reflect any advisement that [the] defendant could face enhanced punishment in the future under the three strikes law." (*Bueno*, at p. 1508.) Because Schlapia's plea form did, in fact, contain an admission that the offense was a serious felony and an advisement of the consequences of that designation, there is sufficient evidence to support the trial court's finding.

V.

Schlapia contends that the trial court improperly made dual use of facts when it relied on the "great violence" aggravating factor to impose upper term and consecutive sentences because the facts that supported that factor also supported the murder, torture, and mayhem counts.

A.

As aggravating factors, the People alleged as to all counts that Schlapia targeted a particularly vulnerable victim, had poor performance on probation or parole, sustained prior convictions of increasing seriousness, and was convicted of other crimes for which consecutive sentences could have been imposed. The People also alleged that the crime involved great violence and violent conduct indicating a serious danger to society as to all counts except for the two possession crimes, and use of a weapon as to all counts but the arson crime.

In a bench trial, the trial court found the allegation that the crime involved great violence true as to the murder, torture, mayhem, and arson counts, but not true as to the assault count. At sentencing, the court imposed an indeterminate sentence of life without

parole for the murder count. The court also imposed a 25-years-to-life sentence on the firearm enhancement attached to the murder count.

As to the determinate sentence, the trial court chose the assault with a semiautomatic firearm count as the principal term and imposed the upper term, saying, "Multiple findings permit me to aggravate this term to nine years. What am I referring to? California Rule of Court 4.421(b)(5). Your prior performance on probation was poor. That was a finding made true. [¶] That your crimes are of increased seriousness. That's 4.421(b)(2). Same rule under (a)(7), multiple convictions. 4.421(b)(1), a demonstration of violent conduct that represents a considerable danger to society if not confined. I've already told you Mr. Schlapia, I think you fit that bill well." The court doubled the sentence to 18 years based on the prior strike conviction. The court additionally imposed a five-year enhancement, consecutive, for causing great bodily injury causing paralysis under section 12022.7, subdivision (b). It also imposed and stayed a three-year enhancement for causing great bodily injury under section 12022.7, subdivision (a). The court imposed a four-year sentence for the firearm use enhancement under section 12022.5, subdivision (a), which it also stayed.

Regarding the mayhem conviction, the trial court imposed a sentence of 16 years (the upper term, doubled), plus 25 years to life for the enhancement under section 12022.53, subdivision (d); both terms were stayed under section 654. The court imposed sentences of one year four months (one-third the middle term) for each of the arson, possession of a firearm, and possession of ammunition counts. The court determined that consecutive sentencing was appropriate because the offense involved "three independent acts of criminality, some grouped together," that had different objectives and came at different times. The court considered whether to stay the possession of ammunition count pursuant to section 654. It concluded that a stay was not appropriate based on the evidence presented at trial. The total sentence was thus 27 years consecutive to life without parole plus 25 years to life.

22

B.

A "court generally cannot use a single fact both to aggravate the base term and to impose an enhancement, nor may it use a fact constituting an element of the offense either to aggravate or to enhance a sentence." (*People v. Scott* (1994) 9 Cal.4th 331, 350.) Likewise, courts "cannot rely on the same fact to impose both the upper term and a consecutive sentence." (*Id.* at p. 350, fn. 12.)

Schlapia claims that the trial court made improper dual use of the fact that his crimes were committed with great violence. We agree with the People that this claim is both forfeited and incorrect. It is forfeited because Schlapia did not assert an objection on this ground below. (*People v. Scott*, *supra*, 9 Cal.4th at p. 353.) It is incorrect because the trial court did not rely on the allegation that the offenses involved great violence to impose the upper term on the only two counts for which the court sentenced Schlapia to the upper term (assault and mayhem). Nor could it have done so for the assault count because that aggravating factor was not found true as to that count. When the court explained its selection of the upper term, it did not cite the crimes' great violence but instead relied on other proven factors in aggravation, including the fact that Schlapia had multiple convictions of increasing seriousness and that the crime involved violent conduct representing a considerable danger to society. The court also did not use the great violence factor to impose consecutive terms; rather, the court described the sequence of events and concluded that the crimes "have different objectives, come at different times, where I think consecutive sentencing is appropriate." For these reasons, Schlapia's conclusory claim that his counsel performed ineffectively by not asserting an objection on this basis also has no merit. (*In re Crew*, *supra*, 52 Cal.4th 126, at p. 150.)

VI.

Schlapia next argues that the trial court should have dismissed his 1998 prior strike conviction under section 1385 given the conviction's age. We see no error in the court's decision.

23

## A.

During the sentencing hearing, Schlapia asked the trial court to strike the 1998 prior strike conviction under section 1385 based on the age of the conviction. Schlapia did not argue the prior strike conviction should be dismissed under any legislative amendments to section 1385, subdivision (c). The court reviewed Schlapia's criminal history, beginning with a 1991 conviction for corporal injury on a spouse, violating a domestic violence protective order, and violations of probation in 1992 and 1994. In 1996, he was convicted of corporal injury to a cohabitant. After the prior strike conviction, he sustained additional convictions in 2005 and 2006, a probation violation in 2010, and a vehicle infraction in 2014. Given this continued criminality, the remoteness of the strike conviction carried less weight. In addition, the court explained, the nature and circumstances of the current offenses were "dramatic" and "sadistic," and, like the prior strike conviction, involved the use of a deadly weapon. Moreover, despite Schlapia's advancing age, he continued to abuse drugs and commit crimes. On these grounds, the court denied the request to strike the prior conviction.

## B.

Section 1385, subdivision (a) authorizes trial courts to dismiss prior strikes "in furtherance of justice." In *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, our state supreme court held that a trial court may strike a prior strike conviction under this provision. In ruling on a *Romero* motion, the court considers "whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161.) A trial court's decision not to strike a prior conviction is reviewed under the deferential abuse of discretion standard. (*People v. Carmony* (2004) 33 Cal.4th 367, 374.)

24

In this case, the trial court did not abuse its discretion when it declined to strike Schlapia's prior strike conviction. Schlapia emphasizes, as he did at the time of his sentencing hearing, the age of his prior strike conviction. This is a relevant factor to consider that weighs in favor of striking the prior conviction. (*People v. Dain* (2025) 115 Cal.App.5th 235, 252.) But "remoteness, by itself, cannot be the basis for dismissing a prior strike conviction." (*Ibid.*) Here, the record shows that Schlapia has an extensive criminal history, and the prior strike conviction involved the use of a weapon. His current offenses were extremely violent and occurred despite his advancing age, reducing the chances he would "age out" of criminal conduct, as the trial court found. Further, Schlapia's history involved violations of probation and a protective order. Under these circumstances, the court acted within its discretion when it concluded that Schlapia's commitment offenses, criminal history, and personal background did not take him outside the spirit of the Three Strikes law.

Schlapia additionally claims that section 1385, subdivision (c) requires dismissal of the prior strike conviction, presumably because subdivision (c)(2)(H) of that statute requires a trial court to afford great weight to the fact that an "enhancement is based on a prior conviction that is over five years old" when deciding whether to strike that enhancement. Schlapia did not raise this claim before the trial court, however, and it is therefore forfeited. (*People v. Torres* (2025) 113 Cal.App.5th 88, 92.) Moreover, as we have previously determined, a strike conviction under the Three Strikes law is not an "enhancement" under section 1385, subdivision (c). (*People v. Burke* (2023) 89 Cal.App.5th 237, 243-244.)

VII.

Schlapia asserts two sentencing errors under section 654. First, he argues that separate sentences could not have been imposed for the murder and assault counts. Second, he contends that he should not have been punished for both the possession of a firearm and possession of ammunition offenses because, under *People v. Lopez* (2004)

25

119 Cal.App.4th 132, he could not be punished for both offenses merely for possessing a loaded firearm.  We reject both claims.

A.

Section 654, subdivision (a) provides in relevant part:  "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision."  The statute thus " ' "precludes multiple punishment for a single act or for a course of conduct comprising indivisible acts.  'Whether a course of criminal conduct is divisible … depends on the intent and objective of the actor.'  [Citations.]  '[I]f all the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, [the] defendant may be found to have harbored a single intent and therefore may be punished only once.' " ' " (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.)  "However, if the defendant harbored 'multiple or simultaneous objectives, independent of and not merely incidental to each other, the defendant may be punished for each violation committed in pursuit of each objective even though the violations share common acts or were parts of an otherwise indivisible course of conduct.' " (*Ibid.*)  A defendant's objective should not be defined too broadly or amorphously, such that it precludes "punishment for otherwise clearly separate offenses." (*People v. Britt* (2004) 32 Cal.4th 944, 953.)

"The defendant's intent and objective present factual questions for the trial court, and its findings will be upheld if supported by substantial evidence.  [Citation.]  'We review the court's determination of [a defendant's] "separate intents" for sufficient evidence in a light most favorable to the judgment, and presume in support of the court's conclusion the existence of every fact the trier of fact could reasonably deduce from the evidence.' " (*People v. Andra* (2007) 156 Cal.App.4th 638, 640-641.)

26

B.

Schlapia claims that he should not have been separately punished for the assault count because it was based on the same intent and objective as the murder count, namely, to kill the victim. We disagree.

The trial court reasoned that Schlapia's crimes occurred in "three parts": the initial shots, the conduct preceding the final shot, and the final shot and acts thereafter. Each part was characterized by a different objective. The court's division of the offenses in this way is consistent with the evidence presented at trial. The initial shots paralyzed the victim, and the jury found true a great bodily injury with paralysis allegation as to the assault count, suggesting those shots constituted that count. As explained above in part III, the final shot formed the basis for the murder count.

Sufficient evidence supports the trial court's implicit conclusion that Schlapia had a different intent and objective for the assault and murder offenses. After Schlapia disabled the victim with the initial shots, he beat and taunted the victim for approximately 13 minutes before firing the fatal shot. Had Schlapia intended to kill the victim from the first moment, he could have done so. (See *People v. Brents* (2012) 53 Cal.4th 599, 618 [section 654 inapplicable where the defendant assaulted the victim, injuring her, then drove her 16 miles away and killed her].) Moreover, Schlapia first shot the victim while the victim was running away and then proceeded to harass and abuse the victim, further suggesting that his initial motivation was to prevent the victim from escaping or to hurt or injure the victim, rather than to kill him. And even if Schlapia had intended to kill the victim with each of the shots, the lapse in time between the initial shots and the final shot supported a finding of "a separate intent to do violence," permitting separate punishments. (*People v. Trotter* (1992) 7 Cal.App.4th 363, 368.) The court's implicit conclusion that the assault and murder counts were separately punishable is thus supported by substantial evidence.

C.

Citing *People v. Lopez*, *supra*, 119 Cal.App.4th 132, Schlapia also claims that section 654 should bar separate punishments for the possession of a firearm and possession of ammunition counts because both crimes arose from the single act of possessing the .380 pistol and the ammunition that was loaded in it. We disagree with this claim as well.

*People v. Lopez*, *supra*, 119 Cal.App.4th 132, precluded multiple punishments "for possessing ammunition in a firearm" and possessing a firearm where "all of the ammunition is loaded into the firearm." (*Id.* at p. 138; see also *People v. Wright* (2025) 113 Cal.App.5th 832, 846 ["the only ammunition was that in the pistol, so possessing the firearm and possessing the ammunition inside were one 'act' within the meaning of section 654"].) As the trial court explained, however, in this case Schlapia possessed ammunition separate from the ammunition loaded in his pistol. In particular, the evidence at trial showed that he possessed a separate box of .380 cartridges in his garage and a bag of .22 caliber ammunition and a shotgun shell in his kitchen. It was reasonable for the trial court to conclude that Schlapia intended to use the other ammunition later for a different purpose.

Schlapia claims that the existence of the ammunition in his house was insufficient to show possession because he may have been unaware of its presence or it may have belonged to someone else. But "possession may be imputed when the contraband is found in a place which is immediately and exclusively accessible to the accused and subject to his dominion and control." (*People v. Williams* (1971) 5 Cal.3d 211, 215.) We similarly find unpersuasive Schlapia's argument that the jury must have understood the ammunition possession count to be based on the ammunition that was loaded in the .380 pistol. That contention rests on speculation, as the prosecution presented evidence of multiple possessory acts. Substantial evidence supports the court's determination that section 654 did not apply.

28

## VIII.

Finally, Schlapia and the People identify a number of errors in sentencing and ask this court to modify the judgment and direct the trial court to correct two sentencing minute orders and issue an amended abstract of judgment. We agree those errors should be corrected.

As noted above, with respect to the indeterminate term, the trial court imposed a sentence of life without parole on the murder count, with a consecutive 25-years-to-life sentence for the firearm enhancement under section 12022.53, subdivision (d). The court's pronouncement of judgment recited only the aggregate sentence, but the court set forth its analysis in a tentative decision before hearing argument from the parties. As described in that analysis, the court first imposed a sentence of 25 years to life for the murder conviction, doubled for the prior strike conviction, for a 50-years-to-life sentence. The court then imposed an additional sentence of life without parole based on the infliction of torture special circumstance finding under section 190.2, subdivision (a)(18) and a second sentence of life without parole based on the mayhem special circumstance finding under section 190.2, subdivision (a)(17)(J). The court stayed the 50-years-to-life sentence and the second life without parole sentence pursuant to section 654. The abstract of judgment and sentencing minute orders reflect that oral analysis.

As the parties note, this sentence is incorrect for two reasons. First, Schlapia should not have been sentenced separately on both the murder conviction and the torture special circumstance finding. Once a defendant has been found guilty of first degree murder and an accompanying special circumstance allegation under section 190.2 has been found true, the penalty "is death or imprisonment in the state prison for life without the possibility of parole." (§ 190.2, subd. (a); see also § 190 [murder punishable "by death, imprisonment in the state prison for life without the possibility of parole, or imprisonment in the state prison for a term of 25 years to life"]; *People v. Noble* (1981) 126 Cal.App.3d 1011, 1016 [special circumstance finding removes possibility of penalty

29

less than life without parole].)  Thus, the trial court's imposition and stay of the 50-years-to-life sentence on the murder count was unauthorized and must be stricken.  (*People v. Sanders* (2012) 55 Cal.4th 731, 743, fn. 13 ["appellate court can correct a legal error resulting in an unauthorized sentence … at any time"].)

Second, Schlapia should not have received two life without parole sentences based on the two special circumstance findings.  Under section 190.2, subdivision (a), a defendant is sentenced to death or life imprisonment without parole "if *one or more* of the [enumerated] special circumstances has been found … true."  (Italics added.)  Defendants do not receive additional punishment based on additional special circumstance findings.  (*People v. Montes* (2014) 58 Cal.4th 809, 874 [a defendant "face[s] no additional punishment merely as a result" of additional special circumstance finding].)  Accordingly, the trial court's imposition and stay of the second life without parole sentence for the section 190.2, subdivision (a)(17)(J) special circumstance finding must also be stricken.  (*People v. Sanders*, *supra*, 55 Cal.4th at p. 743, fn. 13.)

DISPOSITION

The judgment is modified to strike the stayed 50-years-to-life sentence and stayed life without parole sentence based on the section 190.2, subdivision (a)(17)(J) special circumstance finding on the murder count.  As modified, the judgment is affirmed.  The trial court is directed to issue an amended abstract of judgment and minute order to reflect the above changes.  It is further directed to forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.


/s/
FEINBERG, J.

We concur:




/s/
EARL, P. J.




/s/
HULL, J.